UNITED STATES of America, Plaintiff-Appellee,

v.

Andrew Jackson ROBERTSON, Defendant-Appellant.

No. 76–1994.

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1978.

Joseph Chagra, El Paso, Tex. (Court-appointed), for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK,

RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Although we agree with the result reached by the panel majority, we write anew, upon the *tabula rasa* of en banc review, in order to isolate our narrow holding with our focused reasoning. Indeed, we write as much to explicate our holding on the specific issue which we decide as to make explicit our reservation of those other issues which we defer to another day.

On this en banc rehearing, we must determine whether certain admissions made by appellant-defendant, Andrew Jackson Robertson, during a parking lot conversation he had with a confederate and two agents of the Drug Enforcement Administration, were made in the course of plea negotiations, therefore, rendering the admissions inadmissible. We conclude that the parking lot discussion was not a plea negotiation and thus the admissions were not privileged; if it was any kind of bargain, this was a confession bargain—neither more nor less.[1] Given our characterization, our result follows: we vacate Part II. of the panel opinion and affirm the judgment of the District Court, for the reasons we set out below.[2]

## I.

The significant facts are not in dispute.[3] However, because of the nature of the issue presented, we must carefully study the relevant record facts.

On December 16, 1975, agents of the Drug Enforcement Administration exe-cuted a search warrant at a private residence in El Paso, Texas. As a result of the search, the agents seized various chemicals and laboratory equipment allegedly used in the preparation and manufacture of methamphetamine, a Schedule II controlled substance. 21 U.S.C.A. § 812. *See also* 21 U.S.C.A. § 841(a)(1). The agents arrested four persons in the course of the search: Robertson, Robertson's lady friend, William Richard Butigan, and Butigan's wife. After being given their *Miranda*[4] warnings, the four arrestees were taken to the DEA office in El Paso for processing. As the DEA agents prepared to transport the four arrestees from the DEA office to the courthouse for arraignment before a United States Magistrate, the critical parking lot conversation occurred: Robertson and Butigan discussed their involvement in the crime with the DEA agents. Robertson contends that this conversation constituted plea negotiations. Therefore, he would have us conclude that the admissions he made during the course of this conversation should have been excluded from evidence. After a detailed and careful review of the record, we cannot accept Robertson's characterization of this parking lot conversation as plea negotiations. Therefore, we conclude that the admissions he made during this conversation were properly admitted. *See* Fed.R.Crim.P. 11(e)(6); Fed.R.Evid. 410.

Robertson's attorney first raised a challenge to the admissibility of the parking lot conversation in a pretrial motion *in limine* which was concerned with the *Bruton*[5]

---

1. *United States v. Kindrick*, 576 F.2d 675, 677 n.2 (5th Cir. 1978).

2. We adopt so much of the panel majority's opinion which discusses the issue Robertson raised concerning the search warrant. *United States v. Robertson*, 560 F.2d 647, 648–49 (5th Cir. 1977) (Part I.). We further adopt the panel majority's summary disposition of the other issues Robertson raised which merit no discussion. *Id.* at 648 n.1. Thus, the panel opinion, *sans* Part II., is left intact by this *en banc* Court.

3. Supplemental Brief for Appellant on Rehearing *En Banc* at 2; Supplemental Brief for the United States on Rehearing *En Banc* at 2. Thus, our factual inquiry is focused solely upon the facts relevant to the narrow issue which we decide. *See* note 2, *supra.* No one has questioned the accuracy of the transcript.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of a codefend-

problems in admitting Butigan's statements against Robertson since Butigan had already pled guilty.[6] The District Court granted the defense request to be heard outside the presence of the jury on the issue of admissibility under *Bruton* before any testimony would be taken concerning the parking lot conversation. At the appropriate point in the trial, the District Court heard testimony on the motion *in limine*, outside the hearing of the jury. Later, after the District Court had ruled that the accounts of the parking lot conversation were admissible, the same witnesses repeated virtually the same testimony before the jury.

The government first called DEA Agent Pool who had participated in the execution of the search warrant. Tr. 123–141, 233–265. Agent Pool and another DEA agent were assigned to transport Butigan and Butigan's wife from the DEA office to the courthouse for their arraignment. Tr. 134, 237, 258. When Butigan and his wife were placed in the vehicle, before leaving the DEA office parking lot, Butigan asked Agent Pool "if he cooperated, if he could expect to get his wife off." Tr. 135. Agent Pool first testified that Butigan then "said that he was willing to tell us everything we wanted to know, but first he wanted to talk it over with Mr. Robertson before he told us anything." Tr. 135. Before the jury, Agent Pool gave a more detailed account of the exchange:

Q. And then what did Mr. Butigan tell you at that particular time, sir?

A. Initially?

Q. Yes, sir.

A. He said that he wanted to cooperate and tell us everything, and the reason for this he wanted to know if it would help his wife out.

Q. Okay. So what did you tell him, sir?

A. I told him that I couldn't promise him anything, but that we were anxious to have him cooperate with us and that any cooperation he made would probably help him out in the long run.

Q. Okay. Did he do this voluntarily, sir? I mean did he bring this up himself?

A. Yes, sir, we were on our route to take him to the Magistrate when he brought—

Q. You were getting ready to take him to the Magistrate, and he tells you voluntarily that he would like to cooperate in order to try and help his wife, is that correct?

A. Yes, sir.

Q. And you told him, of course, that you couldn't promise him anything, is that more or less what you told him sir?

A. Yes, sir.

Q. Now, did Mr. Butigan seem concerned about his wife?

A. Yes, sir.

Q. What was the next thing that happened in regard to Mr. Butigan cooperating?

A. He stated before he said anything, though, that he wanted to talk it over with Mr. Robertson.

Tr. 259–60. Agent Pool then radioed Agent Widener who was transporting Robertson and his lady friend to their arraignment in another vehicle parked nearby. Tr. 260. Agent Pool explained to Agent Widener, outside the hearing of the four arrestees, that Butigan wanted to tell everything but first wished to talk with Robertson. Tr. 136.[7] Both Robertson and Butigan indi-

ant's oral confession at his and the defendant's joint trial violated the defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment because of the substantial risk that the jury, despite instructions to the contrary, looked to the codefendant's extrajudicial statements in determining the defendant's guilt.

6. The indictment charged Robertson and Butigan, in two counts, with conspiracy to manu-

facture and distribute methamphetamine, 21 U.S.C.A. §§ 841(a)(1), 846, and manufacturing methamphetamine with intent to distribute for remuneration, 21 U.S.C.A. § 841(a)(1). Butigan pled guilty to the conspiracy charged. Tr. 27–30, 356–57.

7. Before the jury, Agent Pool testified that he "told Agent Widener that Mr. Butigan had agreed to cooperate with us and would tell us everything we wanted to know." Tr. 238.

cated to Agent Pool that "they" wanted to "talk" to the agents in hopes of leniency for the women. Tr. 131–32. The agents decided to permit Butigan and Robertson to talk alone, and they were allowed to confer briefly outside the hearing of the agents. Tr. 137, 238–39, 261, 317. The two, Butigan and Robertson, then turned toward the agents and said something like " 'Okay, we'll tell you everything you want to know. What do you want to know?' " Tr. 131.[8] Agent Pool participated in the conversation that ensued which concerned the methamphetamine laboratory the agents had found during the search. Tr. 124–26, 240. Agent Pool questioned both Butigan and Robertson and both responded. Though Butigan carried the conversation, Robertson responded by generally acquiescing and by gestures; he specifically answered only a few questions himself. Tr. 129, 137, 138, 241–42, 246, 263–65. Agent Pool was under the impression that the two were responding together. Tr. 130. During the conversation, both Butigan and Robertson individually stated emphatically that the women were not involved. Tr. 132–33, 245–46, 262–63, 317–18. However, Agent Pool further testified that Butigan and Robertson did admit their own involvement in the criminal episode, in detail which need not concern us now. Tr. 128, 242–45, 296–98.

DEA Agent Widener also testified at the hearing on the motion *in limine* and before the jury. Tr. 141–157, 266–320. He had participated in the search and the arrests. Tr. 141–42, 266–67. He gave the four arrestees their *Miranda* warnings, at the scene of the search. Tr. 142, 148–49, 267–68, 293. When Agent Widener arrested Robertson, he told him that he had participated in the investigation leading up to the search. Tr. 150. Agent Widener began to question Robertson at the scene, but ceased when Robertson said he did not want to answer any questions and said he wanted to

see an attorney. Tr. 150–51, 308. Agent Widener and another DEA agent were assigned to take Robertson and Robertson's lady friend from the DEA office to the courthouse for their arraignment. Tr. 143, 294. Agent Widener testified that before they left the DEA office parking lot Agent Pool called over the radio to "wait-up." Tr. 151, 316, 319. He further testified that when the two agents met outside their vehicles Agent Pool said " 'Mr. Butigan states that he would like to talk to . . . [Robertson] . . . and if they are in agreeance [sic] with each other that they will tell us everything we want to know if we will take in consideration the girls.' " Tr. 151–52. *See also* Tr. 144. Agent Widener also testified that before Robertson and Butigan were permitted to talk together they were told that the agents had no authority to make any promises concerning the women and that all the agents could do was to "make it known to the Judicial Authorities." Tr. 152.[9] Agent Widener, along with Agent Pool, then questioned Robertson and Butigan together. Tr. 144, 145, 295. Butigan generally replied in the first person plural and generally answered for both of them. Tr. 145. The four stood close together and it was Agent Widener's impression that Butigan was speaking for the two of them, since Robertson always nodded his head in agreement. Tr. 297–98, 318–19. Agent Widener's impression was that Robertson was "pretty closed mouthed." Tr. 142.

At the conclusion of the hearing, the District Court decided that there was no *Bruton* problem. Tr. 153–54. At this juncture, and for the first time, defense counsel objected to the admission of the testimony on the additional ground that what he termed "the confessions" were made to gain leniency for the women and were not voluntary. Tr. 154. When the District Court found this objection unpersuasive, defense counsel called Robertson to the stand for the limit-

---

8. During his testimony, Agent Pool also explained that it was Butigan who actually said "O'Kay what do you want to know?' " Tr. 137, 262.

9. Butigan and Robertson were told that the agents "could not make any promises, that

whatever they said or did would be brought to the attention of the Judicial Authorities, but [the agents] could not make any promises per se." Tr. 317. *See* note 13, *infra*.

ed purpose of exploring, outside the presence of the jury, the voluntariness of his "confessions." Tr. 156–61.[10]

Robertson testified that he was arrested at the laboratory site and given his *Miranda* warnings which he promptly followed by refusing to talk with the agents and by requesting a lawyer. Tr. 158. He testified that he did not recall any conversation in which the agents cautioned Butigan and him that they could not make any promise of leniency. Tr. 160. *See* Tr. 160–61. Robertson testified that, when the agents allowed them a private meeting, Butigan said

that the agents had agreed to "try their best to help get [Butigan's wife] out so she could be with the kids and stuff that night" and he asked Robertson to "go along with whatever he said." Tr. 158–59. Robertson further testified that he would not have answered any questions had not Butigan made that request. Tr. 160.[11]

The District Court ultimately concluded that the "confessions" were voluntary,[12] found no violation of the *Bruton* rule, and denied the defense motion *in limine*.[13] Defense counsel still had made no mention of his "plea negotiation" theory of inadmissi-

10. MR. CHAGRA: Your Honor, in addition to my objection to the Bruton ground, I would also object to his testimony being admitted on the ground that it's clear from the testimony of the two officers involved that the only reason that the Defendants talked to the officers was in order to gain leniency for their wife and girl friend, whoever the other girl was, and under these circumstances, Your Honor, the confessions that they gave cannot—said to be involuntarily given. In fact, they were given in hopes of leniency that would be given to their wife and the girl friend which, in fact, did occur, Your Honor, so we would also object to the voluntariness of the confessions.

THE COURT: The Court has heard the evidence additionally that Mr. Robertson, at one stage with Agent Widener, declined to continue any examination whatsoever, and that the conversation was broken off and that, in fact, Agent Widener and Mr. Robertson were proceeding down to another—to the Magistrate when they were called by Agent Pool and informed that, in fact, that he would have conversation, that they got out and there was conversation between the D.E.A. Agents and the—Pool and Widener, that they there discussed whether or not they should be allowed to even talk together. And then before Robertson and Butigan were allowed to talk together, they were told that they could not be given any consideration at all and that the only possible way that could be done was by making it known to Judicial Authorities that they had cooperated.

Now that's the testimony as the Court understands it.

MR. CHAGRA: Well, Your Honor, as I understand it, it's pretty clear to me that Mr. Butigan called this Defendant over and told him that if they talked that his wife and the girl friend would be released or be treated more lenient, and it was only for this reason, as you stated, Mr. Robertson did not want to talk to them, and he made that known to them earlier, and it wasn't until after Mr.

Butigan talked to Mr. Robertson and made known the fact that if they did cooperate the women would be released or be treated more lenient that he intended to talk.

THE COURT: I do not find that persuasive simply—for no other reason, before Mr. Robertson and Mr. Butigan were even allowed to discuss their circumstances, they were warned that there were no promises that could be—that they could make and the only thing the agents could do was have the Court informed of their cooperation.

MR. CHAGRA: Your Honor, I would like to put the Defendant on the stand for this limited purpose, to determine the voluntariness.

THE COURT: Very well, you may do so. Tr. 154–56.

11. At one point, Robertson testified that he could not remember personally answering any question other than supplying the name of a motel where he and Butigan once had stayed. Tr. 159–60. Yet, he also testified that he would not have answered "those questions" if Butigan had not made his request. Tr. 160.

Any waiver of counsel issue based on these facts has not been raised and "does not relate to the primary issue before this [C]ourt." *United States v. Geders*, 566 F.2d 1227, 1229 n.2 (5th Cir.), *rehearing en banc granted. See Nash v. Estelle*, 560 F.2d 652 (5th Cir. 1977), *rehearing en banc granted.*

12. *See Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

13. The District Court also resolved the credibility issue concerning whether the agents actually warned Butigan and Robertson that they had no authority to grant leniency. He believed the agents' versions that such a warning was given:

THE COURT: Well, the only testimony, that I have would tend to impair the Court's earlier decision would be the testimony of Mr.

bility based on Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410. Up until that point in the proceedings, the parking lot conversation was characterized as a "confession" or an "admission" by the defense, by the prosecution, and by the District Court. This char-

> Robertson that, in fact, he does not recall being spoken to concerning—no consideration of leniency or help of leniency from the agents. The agents have testified that they specifically warned them before there was any conversation.
> MR. CHAGRA: Your Honor, the Defendant testified that they did, in fact, promise to help with the women. What he states is that he did not remember them saying that they could not promise them anything.
> THE COURT: Well, I'll abide by my decision. I believe that the protection is adequate and that neither Bruton has been violated nor the rights to counsel, and that the confessions there are, in fact, the confessions of both of them and had Mr. Robertson chosen to deny or to not go along—and he said he did go along. He could have done it, and he had previously made it very clear he did not want to talk until he had a lawyer, and he was given an opportunity after talking to Butigan to reassert that if he chose to, and he chose not to. And I think the Court will deny your motion in limine concerning that conversation.

Tr. 161–62. *See also* note 10, *supra.*

14. MR. CHAGRA: May it please the Court, comes now the Defendant after the Government has rested its case in chief and would make this motion for judgment of acquittal.

> THE COURT: The Court will agree with you, Mr. Chagra. If in fact the *confession* does not stand, the *oral admissions* made by the Defendant to the Government agents, if in fact the Fifth Circuit finds that the Court was in error in allowing testimony concerning those *statements*, that there is no proof as to the Second Count—I don't have that problem with the First Count, the conspiracy however—and as to both of your motions for judgment of acquittal, I will overrule them and deny them.
> MR. CHAGRA: Your Honor, as to the Second Count of the indictment, even if the *confession* is allowed to stand by the Fifth Circuit, Your Honor, the Defendant did not *confess* to manufacturing amphetamine with the intent to distribute it on December 16. And, in fact, stated that—I believe something to the effect that they had manufactured it in the past. This is not what he was charged with, and for that additional ground, we would ask that the Court instruct—
> THE COURT: Well, I will deny that. As you know, the date certain is not absolutely nec-

acterization continued through trial, through the defense motion for judgment of acquittal,[14] through the charge conference,[15] and through the jury instructions.[16] Indeed, as the panel majority noted, Robertson abandoned his challenge to the ad-

> essary nor the proof of the date certain, and by the very nature—both conspiracies and substantive counts sometimes are not susceptible to proof on a specific day, and I will leave that to the jury, but if, in fact, I have erred, I have erred grossly, because the Court has both refused your motion to suppress feeling they were both a valid search warrant and search, and I have denied *your other motion in limine.* So, if in fact I'm in error, I'm badly in error.

Tr. 323–27 (emphasis supplied).

We do allow the "confession" to stand. As the panel majority noted, on this record we need not decide the extent to which promises made in the course of such confession bargaining might render any admissions involuntary under the totality of the circumstances and render them inadmissible. *United States v. Robertson,* 560 F.2d at 651 n.8. We agree with the District Court and the jury; these statements were sufficiently voluntary to warrant their admission into evidence. *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *Crawford v. United States,* 219 F.2d 207, 210–11 (5th Cir. 1955). *See* notes 10, 12, *supra* and accompanying text; note 16, *infra.* *See generally* Note, *Official Inducements to Plead Guilty: Suggested Morals for the Marketplace,* 32 Chi.L.Rev. 167 (1964).

15. THE COURT: Now you had earlier come in Chambers a few minutes ago and orally requested the Court to give an undefined instruction concerning the *confession* or the *admission. You termed it confession.*

> MR. CHAGRA: The *admission* of the Defendant.
> THE COURT: The Court doesn't know whether it would quite rise to that, but I will give an instruction concerning the voluntariness of the *admission,* if any, made by the Defendant in this case.
> MR. CHAGRA: Thank you, Your Honor.
> THE COURT: But you will need to listen carefully to it, because you may still have objection to it, Mr. Chagra. Then the Government is ready to close, also?
> MR. WALKER: Yes, Your Honor.

Tr. 330–31 (emphasis supplied). The defense had no objection to the District Court's charge. Tr. 364. *See* note 16, *infra.*

16. The District Court instructed the jury, in part:

> Now evidence has been introduced that the Defendant, Andrew Jackson Robertson, *ad-*

missions under the voluntariness rubric and urged instead that the admissions were made in the course of plea negotiations for the very first time on appeal. *United States v. Robertson*, 560 F.2d at 650.[17]

> *mitted* that he committed the crimes charged in the indictment. The jury should carefully scrutinize all of the circumstances surrounding the *admissions*, if any, and determine whether they were made freely and voluntarily. If the jury finds that the *admissions* were, in fact, made by the Defendant, and were made freely and voluntarily with an understanding of the nature of his *admissions*, and without fear or coercion, either physical or psychological, or without promise of reward, the jury should consider the *admissions* together with all other evidence in determining the guilt or innocence of the Defendant. However, if the jury finds that the *admissions* were not made freely and voluntarily, the jury should disregard those *admissions* entirely.
>
> Even if you believe from the evidence beyond a reasonable doubt that the *admissions*, if any, of Andrew Jackson Robertson were voluntarily made, you cannot convict the Defendant upon his *confession* or *admissions* alone, unless you believe the same to be true, beyond a reasonable doubt, and unless you further believe, beyond a reasonable doubt, from other corroborative evidence, if you find that there was such evidence introduced in the trial of this case, that the *admissions* of guilt, if any, are true.

Tr. 338–39 (emphasis supplied). The District Court also correctly instructed the jury on the law relating to statements of coconspirators. *See* Tr. 351–52.

17. Since we conclude that the parking lot conversation was not a plea negotiation, we need not reach the issue whether the failure to raise the appropriate objection at trial would have constituted a waiver of the challenge raised for the first time on appeal. Here there simply was no error of any kind to be classified as plain or harmless. Fed.R.Crim.P. 52. *See, e. g., United States v. Nelson*, 574 F.2d 277, 280 (5th Cir. 1978); *United States v. Martinez*, 536 F.2d 1107 (5th Cir.), *cert. denied*, 429 U.S. 985, 97 S.Ct. 505, 50 L.Ed.2d 597 (1976); *United States v. Long*, 323 F.2d 468 (6th Cir. 1963); *Pharr v. United States*, 48 F.2d 767 (6th Cir. 1931); *Hodge v. United States*, 13 F.2d 596 (6th Cir. 1926).

18. Fed.R.Crim.P. 11(e)(6) provides:
> Inadmissibility of Pleas, Offers of Pleas, and Related Statements. Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty

## II.

Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 render inadmissible any statement made "in connection with, and relevant to" an offer to plead guilty.[18] Our objective

> or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and related to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

Fed.R.Evid. 410 provides:
> Inadmissibility of Pleas, Offers of Pleas, and Related Statements
>
> Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

For a discussion of the interrelatedness of these two provisions, *see United States v. Herman*, 544 F.2d 791, 795–96 n.7 (5th Cir. 1977); *United States v. Martinez*, 536 F.2d 1107 (5th Cir.), *cert. denied*, 429 U.S. 985, 97 S.Ct. 505, 50 L.Ed.2d 597 (1976). *See also generally* 8 Moore's Federal Practice ¶ 11.08; Cleary (ed.), McCormick on Evidence, § 265 (1972); 2 Weinstein's Evidence ¶ 410; Wright, Federal Practice and Procedure, §§ 171–177 (1969); Advisory Committee Note to Rule 11(e)(6), reprinted in 62 F.R.D. 286 (1974); Advisory Committee Note to Rule 410, reprinted in 56 F.R.D. 228 (1972), Erickson, *The Finality of a Plea of Guilty*, 48 Notre Dame Law. 835 (1973); Note, *Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas*, 1121 U.Pa.L. Rev. 890 (1964).

A court's supervisory power also could be the basis of excluding such evidence. *See Can-*

here is to determine whether the parking lot conversation should have been excluded under these Rules. Our approach is straightforward. We shall establish a general framework for determining whether a conversation is an inadmissible plea negotiation, apply the analysis to the antecedent facts, and conclude that the parking lot conversation was not a plea negotiation.

Our narrow inquiry is begun within a broader context in which the guilty plea has been recognized as an integral aspect of our criminal justice system. The United States Supreme Court emphasized the importance of guilty pleas and plea negotiations in *Blackledge v. Allison*, 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 736 (1977) (note omitted):

> Whatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail while awaiting completion of criminal proceedings.

*See also Santobello v. New York*, 404 U.S. 257, 260–261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Brady v. U. S.*, 397 U.S. 742, 751–52, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).[19] *See generally* Gora (ed.), Due Process of Law 89–99 (1977).

This Court has consistently emphasized the importance of guilty pleas and the safeguards surrounding the entire process of plea negotiations, plea agreement, and plea taking. Even before the enactment of Fed. R.Crim.P. 11(e)(6) and Fed.R.Evid. 410, this Court "recogniz[ed] the inescapable truth that for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." *United States v. Herman*, 544 F.2d at 796, *citing, United States v. Ross*, 493 F.2d 771, 775 (5th Cir. 1974). *See also* ABA Standards § 2.2; ALI Code § 350.7.

■ Plea negotiations are inadmissible, but surely not every discussion between an accused and agents for the government is a plea negotiation. Suppressing evidence of such negotiations serves the policy of insuring a free dialogue only when the accused and the government actually engage in plea negotiations: "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions." ABA Standards, Introduction at 3. *See Bordenkircher v. Hayes*, 434 U.S. 357, 362, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *Santobello v. New York*, 404 U.S. at 260, 92 S.Ct. 495; *United States v. Stirling*, 571 F.2d 708, 731 (2d Cir. 1978); *United States v. Geders*, 566 F.2d at 1230; *United States v. Herman*, 544 F.2d at 797 ("Statements are inadmissible if made at any point during a discussion in which the defendant seeks to obtain concessions from the government in return for a plea."); ABA Standards §§ 1.8, 3.1(a); ALI Code § 350.3. *See also* Note, *Withdrawal of Guilty Pleas Under Rule 32(d)*, 64 Yale L.J. 590, 594 n. 29 (1955). Thus plea negotia-

---

izio v. New York, 327 U.S. 82, 91, 66 S.Ct. 452, 90 L.Ed. 545 (1946) (Rutledge, J., dissenting), citing Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); United States v. Ross, 493 F.2d 771 (5th Cir. 1974). The scope of the constitutional requirement is unsettled. See United States v. Albano, 414 F.Supp. 67, 69 (S.D.N.Y.1976) and cases cited.

19. Given the critical nature of plea negotiations to our criminal justice system, it is somewhat surprising that legislatures and appellate courts only recently have begun to provide guidance on the standards which are to prevail in plea negotiations, plea agreements and plea taking. See generally ABA Project on Minimum Standards for Criminal Justice of Pleas of Guilty 1–3 (Approved Draft 1968) (hereinafter ABA Standards); ALI Model Code of Pre-Arraignment Procedure, §§ 350.1–.9 (Commentary 1975) (hereinafter ALI Code).

tions contemplate a bargaining process, a "mutuality of advantage," *Brady v. United States*, 397 U.S. at 752, 90 S.Ct. 1463, *quoted in, Bordenkircher v. Hayes*, 434 U.S. at 362, 98 S.Ct. 663, and a mutuality of disadvantage. That is, the government and the accused both seek a concession for a concession, a *quid pro quo*. *United States v. Geders*, 566 F.2d at 1231.[20] The accused contemplates entering a plea to obtain a concession from the government. The government contemplates making some concession to obtain the accused's plea. *See* Note, *Guilty Plea Bargaining: Compromises By Prosecutors to Secure Guilty Pleas*, 112 U.Pa.L.Rev. 865, 866–69 (1964).

To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances. Thus, each case must turn on its own facts. However, the policy underlying Fed.R.Crim.P. 11(e)(6) and Fed.R. Evid. 410 provides the basic orientation toward this characterization. In essence, the rule of inadmissibility is designed to serve both as an incentive and as a prophylactic; the rule both encourages and protects a free plea dialogue between the accused and the government. Given this essential purpose,

the trial court's initial inquiry must be focused on the accused's perceptions of the discussion, in context.

Obviously then, the accused's assertions concerning his state of mind are critical in determining whether a discussion should be characterized a plea negotiation. However, under a totality of the circumstances approach, an accused's subsequent account of his prior subjective mental impressions cannot be considered the sole determinative factor. Otherwise, every confession would be vulnerable to such subsequent challenge. *See United States v. Geders*, 566 F.2d at 1231; *United States v. Herman*, 544 F.2d at 800 (Gee, J., specially concurring). The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances. *Cf. Toler v. Wyrick*, 563 F.2d 372 (8th Cir. 1977); *United States ex rel. Robinson v. Housewright*, 525 F.2d 988 (7th Cir. 1975); *Calabrese v. United States*, 507 F.2d 259 (1st Cir. 1974); *Ford v. United States*, 418 F.2d 855 (8th Cir. 1969).[21]

**20.** In theory, plea bargaining has the potential of alleviating . . . problems of the traditional model [of the criminal justice system]. Sentencing is less unilateral than it is in the traditional model, since the state must secure the defendant's assent before it can impose punishment. The defendant has the opportunity to bargain with the prosecution in a less technical, legalized setting to negotiate the terms of his assent, and thus to become a co-decisionmaker in the sentence determination. Direct participation of this sort not only promotes individual dignity, but also has an instrumental value. Because the defendant may feel morally obliged to honor the compromise that he has struck—that is, to respect the product of the process in which he has participated—he is more likely to feel reconciled to his punishment. Finally, by making the bargaining process appear less arbitrary, the defendant's participation serves the broader function of promoting the political legitimacy of the criminal justice system.

The process value of plea bargaining, then, depends upon the voluntary and intelligent participation of the defendant—his right to

negotiate with the prosecutor and his right to accept or reject the proposed bargain. Unfortunately, because these rights are attenuated in practice, the potential process value of plea bargaining seldom is attained.

Note, *Plea Bargaining and the Transformation of the Criminal Process*, 90 Harv.L.Rev. 564, 577 (1977). *See also generally*, Bishop, *Broken Bargains*, 50 J.Urban L. 231 (1972); Comment, *Withdrawal of Negotiated Pleas: Quid Pro Quo From Defendants*, 5 Sw.L.Rev. 214 (1973).

**21.** Such a two-tiered analysis is not new to our federal jurisprudence. *See, e. g., Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *See generally* Note, *A Reconsideration of the Katz Expectation of Privacy Test*, 76 Mich.L. Rev. 154 (1977). While the government apparently bears the burden of proving that the discussion was not a plea negotiation once the issue has been properly raised, *see United States v. Herman*, 544 F.2d at 799 n. 12, we need not decide the weight of that burden here. *But cf. Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of a confession need be proved only by a prepon-

The initial inquiry into the accused's subjective state of mind must be made with care to distinguish between those discussions in which the accused was merely making an admission and those discussions in which the accused was seeking to negotiate a plea agreement. The trial court must appreciate the tenor of the conversation. *See United States v. Smith*, 525 F.2d 1017, 1020 (10th Cir. 1975). In those situations in which the accused's subjective intent is clear and the objective circumstances show that a plea bargain expectation was reasonable, the inquiry may end. For example, if the accused unilaterally offers to "plead guilty," *United States v. Herman*, 544 F.2d at 793, or to "take the blame," *United States v. Ross*, 493 F.2d at 774, in exchange for a government concession, then the policy underlying Fed.R. Crim.P. 11(e)(6) and Fed.R.Evid. 410 is served only if the discussions are held inadmissible. That is not to say that we *require* "a preamble explicitly demarcating the beginning of plea discussions," *United States v. Herman*, 544 F.2d at 797. Yet, when such a preamble *is* delivered, it cannot be ignored. Indeed, even when such nascent overtures are completely ignored by the government, such express unilateral offers ought to be held inadmissible, if the context is consistent. *See United States v. Brooks*, 536 F.2d 1137, 1138 n. 1, 1139 (6th Cir. 1976) and cases cited. *See also United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir. 1976), *cited in, United States v. Herman*, 544 F.2d at 797 n. 9. ("Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence."); *but see United States v. Levy*, 578 F.2d 896, 901 (2d Cir. 1978) (accused is required to make manifest an intention to seek a plea bargain before choosing the route of self-incrimination). In those situations, such as the present case, in which the record does not disclose a clear expression of a subjective intent on the part of the accused to pursue plea negotiations, the accused's after the fact expressions of his intent must be more carefully evaluated. The trial court must focus searchingly on the record to determine whether the accused reasonably had such a subjective intent, examining all of the objective circumstances.

Somewhat analogous to this two-tiered inquiry is the judicial skepticism accorded after the fact assertions by an accused who claims to have misunderstood the specific terms of a plea agreement. *See generally* Note, *Withdrawal of Guilty Pleas Under Rule 32(d)*, 64 Yale L.J. 590 (1955). Courts have been very reluctant to allow an accused to withdraw a guilty plea merely on allegations of a misunderstanding resulting from an accused's purely subjective beliefs. Yet, when there is objective evidence that the accused had been reasonably and justifiably confused concerning the terms of the plea agreement during plea negotiations, withdrawal is usually permitted as a matter of course. *See, e. g., United States v. Pihakis*, 545 F.2d 973 (5th Cir. 1977); *United States v. Maggio*, 514 F.2d 80, 88 (5th Cir. 1975); *Calabrese v. United States*, 507 F.2d 259, 260 (1st Cir. 1974); *United States ex rel. Curtis v. Zelker*, 466 F.2d 1092, 1098 (2d Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1405, 35 L.Ed.2d 612 (1973); *Bergen v. United States*, 145 F.2d 181, 187 (8th Cir. 1944). *Cf. United States v. Shanahan*, 574 F.2d 1228 (5th Cir. 1978). So too with an accused's after the fact assertions that he intended to negotiate a plea, the objective record must establish that the accused's statements were made in a reasonable belief that he was negotiating a plea agreement. *Johnson v. Beto*, 466 F.2d 478–80 (5th Cir. 1972); *United States v. Clayton*, 435 F.2d 1299, 1300 (9th Cir. 1970). *Cf. United States v. Calimano*, 576 F.2d 637 (5th Cir. 1978); *United States v. Horovitz*, 565 F.2d 1295 (5th Cir. 1978); *United States v. Bean*, 564 F.2d 700 (5th Cir. 1977); *Bryan v. United States*, 492 F.2d 775 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); *Barker v. United States*, 437 F.2d 107 (5th Cir. 1971); *United*

---

derance of the evidence). Here, though the issue was first raised on appeal, we are able to

reach our result because the record is void of any significant indications of plea negotiations.

*States ex rel. Culbreth v. Rundle,* 466 F.2d 730 (3d Cir. 1972).

With this analysis, a distinction will be drawn between offers to do something in furtherance of a negotiated plea, which are inadmissible, and independent admissions of fact, which may be admitted. *See United States v. Shotwell Manufacturing Co.,* 287 F.2d 667, 673 (7th Cir. 1961), *aff'd,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963). "A plea of guilty differs in purpose and effect from a mere admission or an extra judicial confession; it is itself a conviction." *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927). *See also United States v. Benedicks,* 449 F.2d 313 (5th Cir. 1971); *Williams v. United States,* 290 F.2d 217 (5th Cir. 1961). *See generally* Wigmore on Evidence, §§ 815–863 (Chadbourn Rev. ed. 1970). A confession only relates a set of facts and, therefore, requires only a knowledge of the factual situation. A guilty plea is something more; it is an admission of all the elements of the crime charged. *See* ABA Standards § 1.4(a). While all guilty pleas are confessions, not all confessions are guilty pleas. Therefore, it follows that not all confessions are plea negotiations.

We are not suggesting that confessions or admissions made in the course of plea negotiations are admissible under the law of confessions. Such an approach would eviscerate Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410. *Cf. Christian v. United States,* 8 F.2d 732 (5th Cir. 1925). However, confessions or admissions which are either made in the absence of plea negotiations or which are wholly independent from any plea negotiations are still admissible. *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *United States v. Levy,* 578 F.2d at 902. *Cf. United States v. Cawley,* 481 F.2d 702, 709 (5th Cir. 1973). Generally, a person who has been fully advised of his rights may make a full or partial admission to the arresting officers. Such a statement, if otherwise admissible under the general law of confessions, still is admissible despite the fact that the accused makes some request of those in charge. Such a request, without more, does not transform a confession into a plea negotiation. Today, we eschew a simplistic *per se* approach in favor of requiring a wholistic examination of the circumstances surrounding the discussion. Unlike the rule set forth in *Miranda,* Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 do not have as their purpose the protection of criminal defendants from unwise or uninformed confessions. Moreover, application of Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 to circumstances such as those presented in this case would have a substantial adverse effect on important law enforcement interests. It is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others. Statements or confessions made in such circumstances, if they are voluntary and made with full awareness of the person's rights, are reliable, probative and constitutionally admissible evidence. *See* 18 U.S.C.A. § 3501. We do not believe that Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 require otherwise.

### III.

Applying the general framework we have established to the facts we have detailed, we must conclude that the parking lot conversation was not a plea negotiation. And, therefore, we hold that the District Court did not err in allowing the DEA agents to discuss it before the jury.

From a careful study of the record facts, we cannot conclude that Robertson and Butigan [22] engaged in the parking lot conversation with a view toward negotiating a plea agreement. There was something of an attempt at bargaining for a

---

**22.** Robertson and Butigan discussed their crime together, and we treat their admissions together, in the context which surrounded the parking lot conversation. Since they made their admissions together, we cannot separate Robertson's from Butigan's admissions. *But cf. United States v. Mathis,* 550 F.2d 180 (4th Cir. 1976) (statements made during plea negotiations may be used at the trial of another).

government concession here: Robertson and Butigan attempted to bargain with the DEA agents [23] for the immediate release of the women.[24] And, they did receive something of a government concession: the DEA agents told them that, although the agents themselves could not make any deals regarding the women, whatever they did or said would be brought to the attention of the "Judicial Authorities." However, even assuming *arguendo,*[25] that there was bargaining and a government concession, the quintessential *quid* of a plea negotiation *quid pro quo* was missing. The only concession which Robertson and Butigan offered, and the only concession which the government received then, was a confession. Robertson and Butigan did not contemplate entering a plea of guilty in order to obtain the release of the women. A bargained confession, without more, is not a plea negotiation. Our emphasis will be on this aspect of the plea negotiation process; we focus on what Robertson and Butigan were contemplating conceding during the parking lot conversation.

Although we emphasize again that we do not· require any formal ritualistic expression of intent to enter plea negotiations on the part of the accused,[26] it is obvious that neither Robertson nor Butigan *expressly* offered to plead guilty in exchange for a government concession. Here, Robertson's expression of a subjective desire to negotiate a plea came after the fact. Indeed, his assertions came after the trial. Therefore, we must focus searchingly on the record to determine whether Robertson reasonably had such an intent, considering all the objective circumstances.

Butigan himself instigated the parking lot conversation when he told Agent Pool that he wanted to cooperate with the agents by telling all, if he could expect to get his wife off. He was interested in telling the agents everything; he was not interested in plea bargaining. Agent Pool told him that there could be no promises, but that his "cooperation . . . would probably help him out in the long run." But bettering his own position was not on Butigan's mind; he only wanted his wife to be set free. To this end, he was willing to cooperate with the agents in their investigation. This was the attitude adopted by Robertson, after Butigan's entreaties on behalf of Butigan's wife and Robertson's lady friend. Robertson himself testified that he would not have discussed the matter with the agents for any other reason. Before they were permitted to talk privately, Robertson and Butigan were told that the DEA agents had no authority to release the women. They were told that what they did or said would be made known to the "Judicial Authorities." Robertson and Butigan were then only concerned with gaining the release of the women. Knowing that what they said would be brought to the attention of the "Judicial Authorities," [27] they detailed their involvement and sought to exonerate the women. This, then, was the

**23.** Although earlier cases have not focused on the particular government official's bargaining authority, see *United States v. Herman,* 544 F.2d at 798 n. 11 and cases cited, the government would have us hold that Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 are limited to plea discussions with government attorneys and do not reach discussions with law enforcement personnel. The Preliminary Draft of the Proposed Amendments to the Federal Rules of Criminal Procedure by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (February 1978) would so amend Rule 11(e)(6). Since we hold that the parking lot conversation was not a plea negotiation, the authority issue is not before us.

**24.** Since we hold that the parking lot conversation was not a plea negotiation, we need not decide whether offers to plead guilty in exchange for leniency to someone other than the accused are inadmissible under Rule 11(e)(6), Rule 410, or our supervisory power. *See United States v. Tursi,* 576 F.2d 396 (1st Cir. 1978); *United States v. Bartoli,* 572 F.2d 188 (8th Cir. 1978); *United States v. Ross,* 493 F.2d 771 (5th Cir. 1974); *United States v. Carlino,* 400 F.2d 56 (2d Cir. 1968). *Cf. Bordenkicher v. Hayes,* 434 U.S. 357, 364, n. 8, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

**25.** *See* notes 23, 24 *supra.*

**26.** *See* Part II., *supra.*

**27.** *See* note 13, *supra.*

only purpose of the parking lot conversation: they admitted their own complicity in order to exonerate the women. They did not offer to plead guilty. They did not even contemplate pleading guilty.

The whole tenor of the exchange before and during the parking lot conversation reflected an effort to exculpate the women. To Robertson and Butigan, there seemed to be no surer way to exculpate the women than to inculpate themselves. They had to "tell all" in order to establish that the women were not involved. The oft noted code of honor among wrongdoers here included an honor among wrongdoers toward their ladies. Robertson and Butigan told their story because they believed that the truth would exonerate the women. In doing so, they necessarily revealed their own knowledge of and involvement in the illegal conduct. As witnesses to the women's innocence, they necessarily became witnesses to their own guilt. They did not consider either entering a guilty plea or even offering to enter a guilty plea in order to negotiate for a concession from the government. However, they were willing to make statements, which were inherently incriminating, because they hoped to exonerate the women. To this end, they were willing to admit their knowledge of and involvement in the criminal enterprise. But, there is no indication in the record that they were willing to plead guilty or even offer to plead guilty to exonerate the women. As we have noted, there is a significance to their choice between these different means to this end. Robertson and Butigan made these statements voluntarily and with full awareness of their rights. Statements such as these, made in the absence of plea negotiations, are reliable, probative and constitutionally admissible for the jury's consideration. That their cooperation was prompted by a desire to exculpate the women does not transform their admissions into plea negotiations.

In point of fact, there was very little bargaining accomplished. They were told that the agents had no authority to release the women and could only pass on the information which they furnished. Butigan and Robertson cooperated with the agents by filling in such details as where the laboratory was set up, how much methamphetamine they produced, and how they distributed the drug. They each emphatically stated that the women were not involved. This was their only reason for breaking their silence. This is what they sought to accomplish. They were trying to exonerate the women.

We reach this conclusion despite the fact that Butigan eventually did plead guilty and despite the fact that the women ultimately were not charged. That Butigan did plead guilty is, at most, an ambiguous factor since Robertson did not plead guilty and did not mention a plea negotiation until his appeal. Butigan's later plea bargaining was *dehors* this record. It is likely that the women were not charged, due, in large part, to the admissions of Robertson and Butigan coupled with their protestations of the women's innocence. It comes as no surprise to us that the government chose not to prosecute the women, after Robertson and Butigan, who obviously would be in the best position to know and testify concerning the women's innocence, admitted their own culpability and emphatically denied any complicity on the part of the women.

■ There is simply no indication in this record that Robertson and Butigan were negotiating a plea agreement. No one who testified at the hearing on the motion *in limine* or at trial even suggested that he had the impression that they were negotiating for a plea of guilty. More importantly, here the agents carefully informed Robertson and Butigan that no deals could be made then guaranteeing the release of the women. This was not a case in which the government agents either misled the accused or allowed the accused to negotiate under some misconception of the situation. Here the agents were quick to disabuse Robertson and Butigan of the idea that any deal could be negotiated in the parking lot. We must conclude that it was within the contemplation of all the parties to the park-

ing lot conversation that Robertson and Butigan would go to trial, even if their negotiations for the women's release were successful. Statements such as these should not be rendered inadmissible simply because the individual expresses a desire to be cooperative in return for leniency for another. The District Court, the prosecution, and the defense treated the parking lot conversation as an admission throughout the trial. Our own examination of the record facts and understanding of the context of the parking lot conversation leads us to agree. After examining all the objective circumstances concerning the parking lot conversation, we believe that Robertson and Butigan could not have had a reasonable intent to negotiate a plea agreement.

The parking lot conversation was not a plea negotiation. Therefore, the judgment of the District Court is

AFFIRMED.

LEWIS R. MORGAN, Circuit Judge, with whom GOLDBERG and FAY, Circuit Judges, join, specially concurring:

Although I agree with the majority's result, I cannot subscribe to all of its reasoning. I therefore write to isolate what I believe to be the controlling features of this case as well as to point up several differences in emphasis.

I am somewhat troubled by the majority's discussion of the differences between confession bargaining and plea bargaining. In some detail, the majority differentiates between a confession and a guilty plea. This differentiation, though nicely stated, seems largely irrelevant to our present inquiry. There is no question in the present case as to whether the defendant confessed or pled guilty; obviously, no guilty plea was entered. The critical negotiation occurred prior to arraignment. Ordinarily, prior to arraignment, there is no way such a plea can be made. Even so, the fact that a

guilty plea is never made would not change the protected character of previous negotiations if those negotiations contemplated plea bargaining at the time they were undertaken. Thus, the question here is not whether Robertson pled guilty but whether such a plea was contemplated by the pre-arraignment negotiations.

Moreover, simply because a guilty plea can be distinguished from a confession, it does not follow that plea bargaining and confession bargaining are equally distinguishable. In fact, in many cases a so-called confession bargain will contemplate or assume a subsequent plea of guilty. I submit that, prior to arraignment, few things could more compellingly evidence a defendant's commitment not to contest his guilt than what was actually given here—a full confession. Obviously, a confession could subsequently be disavowed but so could an express offer to plead guilty such as the majority seems to require. Indeed, an offer to plead guilty would be easier to later explain away than a full confession. Thus, I have some trouble with the majority's assumption that parties will confess while contemplating a plea of innocence. Only the rare and hopelessly optimistic defendant will fully confess while intending to plead not guilty.[1] Confessions may be later disavowed as a defendant, perhaps after consulting with counsel, re-evaluates his chances. The point is, however, that at the time a confession is given, which is the relevant time for characterizing the transaction, the parties are ordinarily contemplating that no trial contest of the question of guilt will ensue. When such a confession is the result of bargaining, I do not believe the protection of the rules should depend on whether the accused utters a few magic words like, "and, of course, I'm also going to plead guilty." As the court has observed, "if we are overly exacting in deciding which statements come within this standard, we will deter the unrestrained candor

1. Theoretically, a clever defendant might confess planning to invoke the rules of suppression at issue in this case. The majority's opinion would not prevent such conduct. Instead, they may be penalizing only those defendants who lack the sophistication to appreciate whether a protected negotiation is underway or how to insure that a negotiation will be protected, for example, by expressly referencing the subject of a prospective guilty plea.

that often produces effective plea negotiations." *United States v. Herman,* 544 F.2d 791, 796 (5th Cir. 1977). Thus, I conclude that ordinarily a bargained for confession is tantamount to a plea negotiation because the reasonable expectation of all parties is that the question of innocence will be disposed of without trial. Certainly, some situations may arise in which a defendant confesses while contemplating a plea of not guilty. In the present case, however, there is no indication that such an unusual situation occurred.

While the majority expressly reserves the question of whether third party beneficiary negotiations are encompassed by Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410, the opinion nonetheless seems to stress repeatedly that the defendants sought concessions for their ladies rather than themselves. Majority opinion, 1369–1370. At the least, the majority evidently suggest that this circumstance is a factor weighing against characterizing the transaction as plea bargaining. Any such emphasis is misplaced; I can imagine no reason to sever third party beneficiary negotiations from the protection of the rules. Neither the language of the rules nor analogous cases suggest such a distinction. *See United States v. Ross,* 493 F.2d 771, 775 (5th Cir. 1974); *United States v. Bartoli,* 572 F.2d 188 (8th Cir. 1978); *United States v. Carlino,* 400 F.2d 56 (2nd Cir. 1968.) Moreover, the policy underlying these strictures of exclusion is directed to an encouragement of plea bargaining. As the majority noted:

> The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation.

Majority opinion, at 1365, *citing Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 52 L.Ed.2d 736 (1977). If anything, these benefits are augmented in third party negotia-

tions. Both the bargaining defendant and the beneficiary can be spared uncertainty as one accepts guilt while the other is to be relieved of further worry. Further, courts are possibly spared not just one but two trials as the bargainer all but signs and seals his conviction while the beneficiary can escape prosecution altogether. Thus, I am convinced that the rules fully protect third party negotiations; inasmuch as the issue was among the concerns prompting this *en banc* review, I would resolve the issue accordingly.

In addition to its substantive emphasis, I question the manner in which the majority seemingly gloss over Judge Coleman's excellent opinion in *United States v. Ross,* 493 F.2d 771 (5th Cir. 1974). That case held that a transaction essentially on all fours with the present one constituted a protected plea negotiation as a matter of law. The original panel in this appeal distinguished *Ross* as involving the government's failure to keep a bargain while the instant situation presents a defendant backing out of the deal. 560 F.2d at 650–651. For good reason, the *en banc* majority nowhere mentions the distinction utilized by the panel majority. The policy of the pertinent rules seeks to encourage discussion, not to punish promise-breakers. Thus, Robertson's subsequent decision to assert his innocence could not retroactively change the character of the allegedly protected negotiations.

Although wisely eschewing distinction based upon Robertson's reneging, the majority offers no other vehicle for reconciliation with *Ross.* Concededly, *Ross* was decided before the applicable rules became effective. However, in *United States v. Herman,* 544 F.2d 791 (5th Cir. 1977), the court specifically said that the new rules codified rather than modified *Ross. Id.* at 796.[2] Of course, the *en banc* court could now overrule both *Ross* and *Herman,* but instead the majority seemingly overlooks their tension with its present holding and

---

2. In any event, because the new rules sought to expand the realm of protected negotiations, there is no basis for concluding that they would reduce protections advanced under previous caselaw. Thus, even if the new rules do not reach Robertson, the holding of *Ross* and its applicability to his situation remain intact.

had cited both cases with apparent approval. *Majority opinion, at* 1367. In fact, citing *Ross,* the majority says that a defendant's unilateral offer to "take the blame" in exchange for government concession clearly constitutes a protected plea negotiation. *Id.* That situation is exactly what happened in the present case. Here the defendants asserted that they were the guilty parties and they confessed to obtain favorable consideration for their ladies. According to *Ross, Herman,* and now the curious dictum of the *en banc* majority, Robertson's confession should have been suppressed. I do not suggest that reconciliation is impossible or even difficult, but certainly some further explanation is due.

In my opinion, the procedural posture of this case compels affirmance. Under the plain error standard, our duty is to examine whether any reasonable view of the evidence would support a district court determination that a protected negotiation did not occur.[3] In view of the disclaimer of bargaining authority made by the agents in the present case, I cannot say, as a matter of law, that the defendant both actually and reasonably believed that he was plea bargaining. Accordingly, I join in the majority's result.

---

3. This posture contrasts with that of *United States v. Herman, supra,* in which the court reviewed a lower court conclusion that, in spite of the agents' disclaimer, plea bargaining did occur. 544 F.2d at 799. In *United States v. Ross, supra,* at 775, the disclaimer was weaker than that of the present case. A disclaimer of bargaining authority, if sufficiently brought home to the defendant, will erode the reasonableness of any belief that genuine bargaining is to transpire. A confession given in the face of a sufficient disclaimer might be precatory rather than tendered in exchange for a particular concession.

Thus, although I question the majority's emphasis on confession bargaining as opposed to plea bargaining, I conclude that Robertson's transaction may not have been a real negotiation of any kind. The evidence can be reasonably reviewed as portraying defendants who, caught in the midst of incriminating evidence, confessed and requested whatever consideration the authorities might give to their ladies.