[Nos. 21429-2–I; 21445-4–I.   Division One.   August 28, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. GERALD R. PIZZUTO, *Appellant.*

*Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Kathryn Goater, Deputy,* for respondent.

FORREST, J.—On April 9, 1985, Gerald Pizzuto, Jr., and John Rodewald were charged by information with first degree felony murder in the death on March 16 or 17 of Rita Drury. On May 8, 1985, Pizzuto was charged by information with first degree murder in the death on March 30 of John Jones.[1] Pizzuto did not appear for his arraignments and warrants for his arrest remained outstanding. He was apprehended in August 1985 in Great Falls, Montana. He was held on arrest warrants from both Washington and Idaho.

Pizzuto was interviewed in Montana on August 18, 1985, by Detective Davis of the Seattle Police Department. He expressed concern about the prospect of receiving the death penalty in Idaho and a desire to face trial in Washington if promised the prosecutor would not recommend the death penalty. Davis informed him he had no power to make such

---

[1]The information in the death of Jones was later amended, charging Pizzuto with second degree felony murder.

an agreement. Davis spoke with appellant's sister later that day. He told her he could not promise Pizzuto would not receive the death penalty in Washington. She reported this information to Pizzuto.

On August 19, 1985, Detective Davis conducted a second interview with Pizzuto. He told Pizzuto he had communicated his request for a promise that the King County Prosecutor would not recommend the death penalty. Davis reiterated he had no authority to make such an agreement. Nonetheless, Pizzuto admitted he was involved in the allegedly accidental shooting of John Jones. He also stated he was present during the robbery and murder of Rita Drury. On August 20, Davis taped Pizzuto's statement after advising him that King County had told him it would not promise Pizzuto would not receive the death penalty in Washington. While giving his statement, Pizzuto acknowledged Davis had made no promises nor threats. He again admitted accidentally shooting Jones. He also admitted to being in Rita Drury's apartment when she was killed.

On May 23, 1986, Detective Richardson received a collect call from Pizzuto, who asked for Detective Davis. Davis was not available. Pizzuto told Richardson he and John Rodewald were equally guilty in the robbery and homicide of Rita Drury. He called Richardson again on January 23, 1987, reiterating that Rodewald was equally guilty in the Drury case and stating that the Jones homicide was an accident. In a telephone conversation with Detective Gruber on December 19, 1986, Pizzuto stated he was equally guilty in the Drury homicide and that he shot John Jones. Counsel for Pizzuto objected to admission of the taped statement and statements made by Pizzuto during his telephone calls. The court, however, ruled them admissible.

Pizzuto waived extradition to Washington on August 12, 1985. He waived extradition to Idaho on August 26, 1985. Officials from Washington agreed to subordinate their extradition request for Pizzuto to Idaho's request. Upon transfer of appellant to Idaho's custody, Washington placed

a hold on Pizzuto which would be activated if he were released from custody or if found not guilty after trial in Idaho. Pizzuto was convicted in Idaho of robbery, grand theft and two counts of first degree murder. On May 23, 1986, he was sentenced to death for each murder charge, received a life sentence for the robbery charge and 14 years for grand theft.

Upon inquiring when Pizzuto would be available to Washington, officials were advised that the defendant's presence was required in Idaho until posttrial motions were heard. Throughout the remainder of 1986 and during early 1987, state officials continued to advise Idaho of their desire that Pizzuto stand trial for the charges still pending in Washington. On February 4, 1987, after continued communication regarding Pizzuto between Washington and Idaho officials, the King County Prosecutor's office lodged a detainer against the defendant with the Idaho State Correctional Institution indicating its intent to return Pizzuto to King County. On March 24, 1987, Pizzuto was transported from Idaho to the King County Jail.

Upon Pizzuto's return to King County, trial dates were scheduled for July 10, 1987, for the Jones case and July 13, 1987, for the Drury case. The appellant waived his right to speedy trial in both cases after 16 days in the custody of King County. He subsequently signed additional waivers for both cases prior to any further expiration of the 60–day limit. A bench trial commenced in the Jones case on September 11, 1987. Pizzuto was found guilty as charged. A jury trial commenced in the Drury case on October 14, 1987. Pizzuto was found guilty as charged.

## SPEEDY TRIAL ISSUE

Pizzuto first claims that the State breached the speedy trial requirements of CrR 3.3 and CrR 4.1 by agreeing to allow Idaho to proceed first on its charges, resulting in a 2–year delay for his arraignment. He argues the informations must be dismissed because of the delay. The State claims that the delay in this case is excluded under CrR 3.3(g). It

further asserts it met any duty of good faith and due diligence that may exist.

CrR 3.3 provides in pertinent part:

**(g) Excluded Periods.** The following periods shall be excluded in computing the time for arraignment and the time for trial:

. . . .

(2) Preliminary proceedings and trial on another charge except as otherwise provided by CrR 3.3(c)(5) [relating to rearraignment];

. . . .

(6) The time during which a defendant is detained in jail or prison outside the state of Washington or in a federal jail or prison and the time during which a defendant is subjected to conditions of release not imposed by a court of the State of Washington;

From the time the State filed the information until Pizzuto's arrest in Montana, Pizzuto was a fugitive. He concedes this period is excluded from speedy trial calculations. Whether he was involved in "preliminary proceedings and trial" during the remainder of time before arraignment in Washington, however, depends on the meaning given to "trial" in CrR 3.3(g)(2).

A. Meaning of "Preliminary Proceedings and Trial".

In *State v. Bernhard*,[2] the court held that CrR 3.3(g)(2) excluded from speedy trial calculations the entire period that a defendant is involved in a trial on another matter.[3] *Bernhard* did not decide, however, whether "preliminary proceedings and trial" can be excluded beyond the time of the guilty plea.[4]

---

[2]45 Wn. App. 590, 726 P.2d 991 (1986), *review denied,* 107 Wn.2d 1023 (1987).

[3]More specifically, the *Bernhard* court held that CrR 3.3(g)(2) does not require the jurisdiction whose charges are in question to bring the defendant before the court during the pendency of the other proceedings even though his whereabouts are known and he could be physically produced.

[4]*Bernhard,* 45 Wn. App. at 598 n.3, states:

"*We express no opinion as to whether or under what circumstances the CrR 3.3(g)(2) exclusion involving '[p]reliminary proceedings and trial' might extend past the date of a defendant's guilty plea. The ABA standards, upon which the criminal rules are based, should be consulted in cases 'where a hiatus appears in*

■ Here, Pizzuto was held in Idaho for many months after the jury verdict and before imposition of the death sentence. Pizzuto was required to remain in Idaho for completion of all posttrial motions before an appeal of his sentence could be initiated. Because of various continuances, approximately 10 months elapsed before all relevant motions had been heard. We interpret "trial" as used in CrR 3.3(g)(2) to encompass sentencing and posttrial motions regardless of the order in which they occur. No authority contrary to this interpretation has been cited, nor has our research disclosed any.

The purposes behind promulgation of the CrR 3.3(g)(2) exclusion warrant such an interpretation. Our interpretation permits one jurisdiction to fully complete its prosecution before another jurisdiction is required to begin. Thus, the requirement that the defendant be physically present for both of his criminal proceedings can be satisfied.[5] This interpretation also enables a jurisdiction to await the results of the defendant's other trial and motions before deciding whether to proceed. Until posttrial motions are heard and a sentence imposed, a second jurisdiction cannot make an informed decision.

The same considerations that exempt preliminary proceedings from speedy trial calculations also justify exempting posttrial proceedings. Interpreting the rule to require the defendant to be produced in the second jurisdiction whenever, after trial, he is not physically in a courtroom within the first jurisdiction would prove awkward when

CrR 3.3.' *State v. Striker*, 87 Wn.2d 870, 873, 557 P.2d 847 (1976). However, the standards are silent as to when the exclusionary period for trial on another charge should end. *See* 2 American Bar Ass'n, *Standards for Criminal Justice*, Std. 12–2 (2d ed. 1980). In *State v. Peterson*, 90 Wn.2d 423, 428, 585 P.2d 66 (1978), the defendant pleaded guilty to a federal charge in March 1975 and was confined on that charge in May 1975. The court in dicta indicated the exclusionary period would extend to May 1975. However, resolution of the precise limits of the exclusionary period was unnecessary to the decision, since the speedy trial period was violated in any case." (Italics ours.)

[5]*See* CrR 3.4(a).

arraigning and trying a defendant also charged in another county; it would be an almost impossible burden when arraigning and trying a defendant charged in another state.

This case illustrates the wisdom of such an interpretation. The Idaho conviction resulted in the death penalty. Pizzuto was needed in Idaho to consult with his attorneys about posttrial motions, to execute waivers of the applicable time limits, and was required to be physically available to attend court hearings. Even if Idaho had been willing to disrupt their proceedings by returning the defendant to King County for arraignment, this would have triggered the 60–day speedy trial requirement of CrR 3.3. Such a disruptive procedure might have jeopardized prosecution of Pizzuto in both jurisdictions, and certainly would have prejudiced his ability to defend himself in both proceedings.

*State v. Pacheco,*[6] however, may create uncertainty as to this interpretation of CrR 3.3(g)(2). In *Pacheco,* the court wrote:

> *State v. Alexus,* [91 Wn.2d 492, 588 P.2d 1171 (1979)] held that where a defendant *is in jail awaiting sentencing* on another charge and is amenable to process, the State must prove that it acted with good faith and due diligence to bring the defendant to trial after the filing of the information.

(Italics ours.) The phrase, "awaiting sentencing", intimates that the exclusion of CrR 3.3(g)(2) may terminate after conclusion of the trial and before sentencing.

The *Alexus* court did not discuss the applicability of the CrR 3.3(g)(2) exclusion. The defendant was in prison for almost 6 months following sentencing, resulting in expiration of the speedy trial limit. Hence, the court made no reference to the time between trial and sentencing. The meaning of "trial" was not at issue. Instead, the court relied upon requirements for showing the "unavailability" of a defendant under the former CrR 3.3(f) to reach its decision. Therefore, we do not find the language in *Pacheco* to preclude our holding that "trial" as used in CrR 3.3(g)(2)

---

[6]107 Wn.2d 59, 65, 726 P.2d 981 (1986).

encompasses posttrial motions and sentencing, regardless of the order in which they occur.

B. Duty of Good Faith and Due Diligence Under CrR 3.3(g).

Pizzuto relies upon *State v. Pacheco*[7] and a line of similar cases[8] to assert that the State has a duty of "good faith and due diligence" under CrR 3.3 and CrR 4.1 to arraign him promptly after filing the information. In *Pacheco,* the defendant was charged by complaint in Snohomish County District Court on January 5, 1983, and an arrest warrant issued. He was ultimately arrested in King County on August 26, 1983. The Snohomish County Prosecutor, however, was not notified. The court held there was no violation of the time for arraignment or trial under CrR 3.3(g)(2). The time the defendant spent under arrest in King County Jail was time during which he was held for hearing on another charge.[9] This seems a straightforward application of the rule as written.

Although this would seem dispositive, the court quoted with approval *State v. Alexus,*[10] which held that the State must demonstrate it acted with good faith and due diligence to bring a defendant to trial after filing of the information.[11] *Alexus* adopted the rule from *State v. Peterson,*[12] where the court wrote:

> Finally, under CrR 3.3(f) the speedy trial time limits applicable to a defendant who is "absent and thereby unavailable for

---

[7]107 Wn.2d 59, 726 P.2d 981 (1986).

[8]*State v. Striker,* 87 Wn.2d 870, 557 P.2d 847 (1976); *State v. Peterson,* 90 Wn.2d 423, 585 P.2d 66 (1978); *State v. Alexus,* 91 Wn.2d 492, 588 P.2d 1171 (1979).

[9]*Pacheco,* 107 Wn.2d at 64–65.

[10]91 Wn.2d 492, 588 P.2d 1171 (1979).

[11]*Pacheco,* 107 Wn.2d at 65.

[12]90 Wn.2d 423, 428, 585 P.2d 66 (1978), citing *State v. Williams,* 87 Wn.2d 916, 557 P.2d 1311 (1976).

trial" do not run until the defendant is actually present. However, unavailability as established under this rule can be shown only if the prosecution demonstrates good faith and diligent efforts to obtain the availability of the defendant.

The former rule to which the *Peterson* court applied the good faith and due diligence test, CrR 3.3(f),[13] currently has no equivalent. The rule was deleted from the Superior Court Criminal Rules by order of the Washington Supreme Court, dated July 1, 1980.[14] Significantly, the State has never before been required to demonstrate good faith and due diligence to exclude time from speedy trial calculations when a defendant was involved in "[p]reliminary proceedings and trial on another charge".[15]

■ Despite some general language in the case which may suggest the contrary, *Pacheco* did not directly hold that a "good faith and due diligence" test applies to CrR 3.3(g)(2). Hence, we interpret *Pacheco* to apply CrR 3.3(g)(2) as written, and conclude that the entire period during which Idaho proceedings were conducted are properly excluded in calculating the speedy trial period.

C. Duty of Good Faith and Due Diligence in Extradition.

Pizzuto next argues that even if his time in Idaho is excludable under CrR 3.3(g)(2), the State's failure to secure his presence immediately following his waiver of extradition to Washington bars its use of any speedy trial exclusion. Washington's subordination of its extradition request to

---

[13]CrR 3.3(f) formerly provided:

"**Absence of Defendant.** If and in event the defendant is absent and thereby *unavailable* for trial or for any pretrial proceeding at which his presence is required, the time period specified in section (b) or (c) shall start to accrue anew upon defendant's being actually present in the county wherein the criminal charge is pending, and his presence appearing upon the record of the court." (Italics ours.)

[14]*See* Amendment of Superior Court Criminal Rules, 93 Wn.2d 1122, 1132 (1980).

[15]CrR 3.3(g)(2).

Idaho's request is asserted as a lack of good faith and due diligence. He relies for support principally upon *Pacheco, Peterson* and *State v. Nelson.*[16] We disagree.

In *Nelson* there was a 6–month delay between filing of the charges and arraignment. The delay was due to confusion as to the defendant's address. There was no claim that he fell within any of the specifically excluded time periods provided under CrR 3.3(g). The court cited unavailability of the defendant as a ground for excluding the time period elapsed, even though CrR 3.3 no longer contains this exclusion. It stated that unavailability could only be shown if the prosecution demonstrated good faith and diligence to obtain the defendant's availability.[17] The court then dismissed the charges after applying this "good faith and due diligence" rule. Read in conjunction, *Pacheco, Nelson* and a line of similar Washington cases[18] establish that although the State may still rely on the "unavailability" of a defendant to exclude time from speedy trial calculations, the State's allegation of unavailability is to be tested by the "good faith and due diligence" standard.

We note that when defendants charged in Washington are involved in criminal proceedings outside the state, there will be a substantial overlap between CrR 3.3(g)(2), which excludes "preliminary proceedings and trial", and CrR 3.3(g)(6), which excludes time "in jail or prison outside the state of Washington". Applied literally, CrR 3.3(g)(6) would be dispositive of this case. Pizzuto was first a fugitive, then in custody until his return to King County. Such an interpretation, however, would be inconsistent with the strong

---

[16]47 Wn. App. 579, 736 P.2d 686, *review denied,* 108 Wn.2d 1024 (1987).

[17]*Nelson,* 47 Wn. App. at 584, quoting *State v. Peterson,* 90 Wn.2d at 428.

[18]*State v. Hunnel,* 52 Wn. App. 380, 760 P.2d 947 (1988); *State v. Hanson,* 52 Wn. App. 368, 760 P.2d 941, *review denied,* 111 Wn.2d 1030 (1988); *State v. Holien,* 47 Wn. App. 124, 734 P.2d 508 (1987); *State v. Baxter,* 45 Wn. App. 533, 726 P.2d 1247 (1986); *State v. Allen,* 36 Wn. App. 582, 676 P.2d 501 (1983).

policy of prompt disposition of criminal charges implemented by CrR 3.3 and CrR 4.1.

We hold that when CrR 3.3(g)(6) is applied to exclude time periods not excluded under CrR 3.3(g)(2), the defendant's unavailability must be tested under the "good faith and due diligence" rule. This test is necessary for the same reasons underlying the requirement that good faith and due diligence be shown when the defendant is allegedly unavailable, and is a logical extension of the rule.

We apply this test to the State's decision to defer to Idaho's extradition request. Pizzuto contends that where there are charges in several jurisdictions, the jurisdiction which first has physical control of the defendant, or the opportunity for such physical control, must be the jurisdiction to first proceed to trial. Nothing in the rules so requires. No case so holds.

Such a rule would permit the defendant to select the first jurisdiction in which to be tried by deciding which waiver of extradition to first execute. To state the claim is to refute it. Public policy requires that a defendant charged in several jurisdictions receive a prompt and fair trial on each set of charges. This requires comity and cooperation between jurisdictions, not competition.[19] Here, the Idaho homicides involved multiple defendants and the death penalty was sought. The Washington charges, though serious, involved neither consideration.[20] Nothing in CrR 3.3 nor in the extradition clause[21] prohibits such cooperation. These were sound and appropriate reasons for Washington to defer to Idaho's extradition request.

The decision to defer to Idaho did not show a lack of good faith and due diligence. The State did not violate

---

[19]*Michigan v. Doran*, 439 U.S. 282, 287–88, 58 L. Ed. 2d 521, 99 S. Ct. 530 (1978).

[20]John Rodewald, Pizzuto's codefendant in the Drury homicide, was separately tried and convicted in Washington.

[21]U.S. Const. art. 4, § 2.

Pizzuto's right to a speedy trial under CrR 3.3. Pizzuto acknowledges his constitutional speedy trial right is not at issue.

## ER 410 ISSUE

Pizzuto contends that his taped statement to Detective Davis and the statements and telephone calls he initiated to various officers as to the Drury case should have been excluded pursuant to ER 410 because he was negotiating a plea. ER 410 provides in part:

> Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, . . . or of an offer to plead guilty . . . to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

Prior to 1980, the language of Fed. R. Evid. 410 was virtually identical to the quoted language of the Washington rule. The only Washington case applying ER 410, *State v. Jollo*,[22] did not deal with conversations between police officers and the defendant. Hence, federal cases decided under the former language of Fed. R. Evid. 410 provide an appropriate guide to interpretation of the Washington rule.[23]

The application of Fed. R. Evid. 410 and the identical Fed. R. Crim. P. 11(e)(6) to claimed plea bargaining negotiations between law enforcement officers and defendants varies widely among the federal courts. We find most persuasive the court's reasoning in *United States v. Grant*.[24] The *Grant* court specifically disapproved *United States v. Herman*,[25] the case principally relied upon by Pizzuto, which broadly interpreted Fed. R. Evid. 410 and emphasized the defendant's subjective understanding in determining whether plea negotiations were conducted. It noted

---

[22] 38 Wn. App. 469, 685 P.2d 669 (1984).

[23] 5 K. Tegland, Wash. Prac., *Evidence* § 105, at 343–44 (3d ed. 1989).

[24] 622 F.2d 308 (8th Cir. 1980).

[25] 544 F.2d 791 (5th Cir. 1977).

that the drafters of Fed. R. Evid. 410 sought to exclude only evidence arising out of formal plea negotiations between a government attorney and defendant's counsel after charges had been, or were about to be, filed.[26]

The *Grant* court followed the holding of *United States v. Stirling*,[27] applying the rule only to statements made during bargaining between counsel. It expanded *Stirling* by holding that the rule also applied to statements made to a law enforcement official with express authority to convey a plea offer. Statements made to an official without such authority were not excludable under the rule, but their admissibility was determined by examining whether they were voluntarily made. We find this approach persuasive.

■ We hold that application of ER 410 is limited to plea negotiations with prosecuting attorneys, or with their agents who possess express authority to plea bargain, and defense counsel or the defendant. Our Supreme Court has recognized the significant utility of bright line rules.[28] Tests which weigh the "totality of the circumstances"[29] generate repeated appeals with finer and finer distinctions. The consumption of legal resources would be justifiable if the public benefited from better results. Adoption of something less than a bright line rule in this context, however, would only

---

[26]*Grant*, 622 F.2d at 313. *See also United States v. Arroyo–Angulo*, 580 F.2d 1137, 1148 (2d Cir. 1978), *cert. denied*, 439 U.S. 913 (1978); 2 J. Weinstein & M. Berger, *Evidence* ¶ 410[08], at 410–54 (1988). The *Grant* court noted that subsequent to *Herman*, the advisory committee on the Federal Rules of Criminal Procedure, in its note on the proposed amendments to Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410, said that the rules relative to plea negotiations were never intended to extend to discussions between law enforcement officials and the defendant. Apparently, the United States Supreme Court and Congress agreed since the amendment was approved and became effective. *Grant*, 622 F.2d at 313 n.3.

[27]571 F.2d 708, 731 (2d Cir. 1978), *cert. denied*, 439 U.S. 824 (1978).

[28]*State v. Stroud*, 106 Wn.2d 144, 720 P.2d 436 (1986); *State v. Patterson*, 112 Wn.2d 731, 774 P.2d 10 (1989).

[29]*See, e.g., United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978).

result in uncertainty for the law enforcement officers and greater numbers of cases for the courts. A defendant's rights as to statements made to officers continue to be protected by well established law which tests voluntariness.

This interpretation of ER 410 reaches substantially the same result as reached by the amendment of the federal rule.[30] Washington's failure to adopt the federal amendment does not militate against our decision. In contrast to the federal courts, the Washington courts have not been confronted with cases invoking the rule as to conversations between officers and defendants.

Limiting ER 410 to plea negotiations between counsel, or the prosecutor and defendant when the defendant declines representation, fully serves the purposes of the rule by encouraging and protecting plea bargaining. It informs prosecutors and law enforcement personnel that plea bargaining is for counsel and investigation for officers. Plea bargaining between unauthorized officers and defendants should not be countenanced; they may not be fully informed as to the requirements for, nor the ramifications of, a guilty plea. Defendants' statements to law enforcement officers are amply protected under *Miranda* principles and by the requirements for establishing the voluntariness of a statement without reference to ER 410.

The facts of this case do not establish any plea bargaining. Bargaining involves a quid pro quo. The accused

---

[30]Fed. R. Evid. 410, as amended, reads:

**"Inadmissibility of Pleas, Plea Discussions, and Related Statements**

"Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

"(1) a plea of guilty which was later withdrawn;

"(2) a plea of nolo contendere;

"(3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or

"(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."

enters a plea bargain to obtain a concession from the State, and the State agrees to make some concession to obtain the accused's plea.[31] Pizzuto knew that Detective Davis had no authority to bargain. The King County Prosecutor never bargained nor agreed to bargain. Pizzuto asserts that he did not want to go to Idaho and wanted Washington to agree to refrain from seeking the death penalty. He further argues that he repeatedly offered to come to Washington, plead guilty to the Jones homicide and provide information about the Drury homicide. The record does not substantiate these claims. Most significantly, before any discussions with Detective Davis, who allegedly bargained on behalf of King County, Pizzuto waived extradition to Washington. Agreeing to come to Washington was no longer a bargaining chip.

The only possible issue available for bargaining would have been an agreement to plead guilty in return for a promise the State would not seek the death penalty. However, Pizzuto never bargained for a plea during any of his three meetings with Detective Davis. Pizzuto was explicitly informed by Davis during their first meeting on August 18, 1985, that Davis had no authority to make a death penalty deal. Pizzuto knew Davis could only relay to the King County Prosecutor any offers made. Pizzuto merely offered to discuss the Washington homicides in exchange for a promise of no death penalty. He did not offer to plead guilty.

On August 19, 1985, Detective Davis reiterated he had no power to make deals. Davis made no representations that a deal was forthcoming. Despite this information, Pizzuto admitted he had accidentally killed John Jones and said he was present when Rita Drury was killed. By the time his statement was taped on August 20 during his third meeting with Davis, Pizzuto had been informed that the King County Prosecutor would make no deal regarding the death penalty. Nonetheless, Pizzuto again admitted to accidentally killing Jones, and to being present during the Drury

---

[31]*Robertson,* 582 F.2d at 1365–66.

homicide. At the conclusion of the taped interview, Pizzuto confirmed that his statements were given voluntarily, without inducement by threat or promise. He at last offered to plead guilty if he were promised he would not receive the death penalty in Washington. However, he already had been unequivocally informed that no promises would be given. Nothing remained to be bargained.

Finally, Pizzuto made unsolicited telephone calls to various Seattle detectives concerning the Drury case. The statements made during the calls cannot be construed as part of a plea bargaining process. Although a defendant may volunteer information hoping to benefit from cooperating, much more is required to establish that the defendant's statements are part of plea negotiations.[32]

As a factual matter we find that the defendant's various statements were not made as part of any plea negotiation process. As a matter of law, they do not violate ER 410 because the discussions were between the defendant and a law enforcement officer without authority to plea bargain. Any objection to the admission of Pizzuto's statements would have to allege they were not voluntary. Nothing in the record suggests a basis for such an objection, nor has it been urged on appeal.

### SUFFICIENCY OF THE EVIDENCE

The court tried the Jones homicide case on stipulated police reports and arguments of counsel. The court found Pizzuto guilty of second degree felony murder in the course of an assault. Pizzuto contends insufficient evidence existed to convict him. We disagree.

---

[32]As stated in *Robertson*, 582 F.2d at 1368: "[C]onfessions or admissions which are either made in the absence of plea negotiations or which are wholly independent from any plea negotiations are still admissible. . . . Generally, a person who has been fully advised of his rights may make a full or partial admission to the arresting officers. Such a statement, if otherwise admissible under the general law of confessions, still is admissible despite the fact that the accused makes some request of those in charge. Such a request, without more, does not transform a confession into a plea negotiation."

RCW 9A.32.050 states in part:

(1) A person is guilty of murder in the second degree when:

. . . .

(b) He commits or attempts to commit any felony other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants; . . .

On March 30, 1987, Pizzuto went to John Jones' trailer carrying a loaded weapon. Once inside the trailer, Pizzuto and Jones argued. After Jones threatened him, Pizzuto pulled his gun, cocked it, and with his finger on the trigger, pointed it at Jones. Appellant claims that Jones lunged at him and the gun accidentally fired. Jones was shot in the head and died from the wound. Pizzuto fled, but left one of his gloves behind. He attempted to hide the matching glove under the seat of a car, but it was given to the police. Appellant was seen with the murder weapon later in the evening. He admitted shooting Jones in a statement to Detective Davis on August 20, 1985, and in subsequent telephone calls to Detectives Richardson and Gruber.

The trial court found that pulling the gun and cocking it was an inappropriate response to Jones' verbal attack and constituted second degree assault. When Jones was killed in the course of the assault, Pizzuto was responsible for second degree felony murder. The court also found appellant was the initial aggressor and could not invoke self–defense. In reviewing the sufficiency of the evidence to support a guilty verdict in a criminal case, the appellate court views the evidence most favorably to the State and determines whether any rational trier of fact could have found guilt beyond a reasonable doubt.[33] Pizzuto was reasonably found guilty of the Jones homicide beyond a reasonable doubt. There was sufficient evidence to support his conviction.

---

[33]*State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980); *Jackson v. Virginia,* 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

The judgment is affirmed.

SWANSON and SCHOLFIELD, JJ., concur.

Review denied at 113 Wn.2d 1032 (1989).