

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-120-CR

ISSAC WRIGHT                                                      APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

In two issues, appellant Issac Wright contends that his conviction and ten year sentence for aggravated sexual assault of a child should be reversed and remanded to the trial court for a new trial because his guilty plea was not freely and voluntarily entered.  We affirm.

**Background**

On December 21, 2005, the State charged appellant with three counts of aggravated sexual assault of a child. The trial court had already appointed Roxanne Robinson as appellant's attorney on October 19, 2005.

In early January 2006, Robinson filed a motion for a competency examination, in which she stated that appellant "hears voices, . . . does not always appear to understand what is said to him and [his] responses are frequently not responsive to [the] issue at hand." The trial court granted the motion, and Dr. Ross Tatum examined appellant on January 12, 2006. Although Dr. Tatum concluded that appellant was competent to stand trial, he did diagnose appellant with "Psychosis NOS" and noted that appellant's intelligence was "in the low average." Dr. Tatum also concluded that appellant "demonstrated an understanding of the pleas of guilty and not guilty and of the plea bargain process. After being taught the pleas of 'no contest' and 'not guilty by reason of insanity', he was later able to again discuss these pleas and how they might be used." According to Dr. Tatum, appellant demonstrated understanding of "the role of those who would participate in the courtroom process" and the confidential nature of his relationship with his attorney. Appellant also showed "the ability to engage in a reasonable and rational

2

manner"; however, Dr. Tatum noted that appellant should continue his medication and psychiatric treatment.

Approximately nine months later, on October 19, 2006, Robinson filed a second motion for a competency examination, stating that appellant hears voices. Dr. Barry Norman examined appellant and found him competent to stand trial. Dr. Norman's findings regarding appellant's mental state were similar to Dr. Tatum's. Dr. Norman noted that appellant understood legal concepts better if explained to him "in a simple straightforward manner without legal jargon." According to Dr. Norman, the jail psychiatrist had discontinued appellant's medication; Dr. Norman recommended that it be restarted immediately.

In November 2006, appellant filed a pro se Application for Writ of Habeas Corpus seeking to be released with no bond or to have his bond reduced. Additionally, appellant filed several pro se motions in December 2006: a motion for examining trial, motion for DNA testing, and motion requesting *Brady* evidence from the State.

On January 9, 2007, the State offered appellant a ten-year plea bargain. Thereafter, on March 21, 2007, appellant pled guilty pursuant to the plea bargain to one count of aggravated sexual assault of a child. He signed written plea admonishments, and the trial court sentenced him in accordance with the

3

plea bargain. On March 30, 2007, appellant's mother wrote a letter to the court in which she claimed that appellant was afraid for his life and did not understand what he was doing when he pled guilty. She claimed that Robinson "threaten[ed] him and told him he could not have any black [jurors] on his case, and that none of the witnesses . . . would be able to testify on his behalf." She also said that Robinson "told him he would get 49 years and made other threats to him if he didn't take the 10." Appellant's mother stated that the charges against appellant had been fabricated by her ex-lover and that she was afraid for her son's life in prison because of his medical problems.

Appellant also wrote a letter asking to withdraw his guilty plea because he "did not understand and was very afraid when [Robinson] told [him] that there could not be any black jury or any black witnesses on [his] case, and that if [he] didn't take the ten year[s] that [he] would get 49 years instead." According to appellant, this concerned him because "everything about this case is black[:] all parties involved and all witnesses."

The trial court appointed new counsel for appellant, who filed a motion for new trial on April 16, 2007 alleging that appellant's guilty plea was involuntary because it was based on his mistaken belief that no African-

4

Americans would be allowed to serve on the jury.[1]  After an evidentiary hearing

on May 11, 2007, the trial court denied the motion for new trial.  However, the

trial court gave appellant limited permission to appeal the voluntariness of his

plea.[2]

## Issues on Appeal

In two issues, appellant contends that we should reverse and remand this

case for a new trial because his guilty plea was involuntary.  Specifically,

appellant contends that his guilty plea is void because it was not entered

knowingly and voluntarily, an issue we review based on the relevant

circumstances as set forth in the record.  *See Boykin v. Alabama*, 395 U.S.

238, 242, 89 S. Ct. 1709, 1712 (1969).  He also contends that the trial court

should have granted his motion for new trial for the same reason, an issue we

review for an abuse of discretion.  *See Holden v. State*, 201 S.W.3d 761, 763

---

[1] In an affidavit attached to the motion, counsel notes appellant's mental issues and says appellant told him Tarrant County MHMR was currently treating him.

[2] The trial court did not rule on the motion at the hearing; instead, the judge deferred ruling until after she had read affidavits from Robinson and her intern that the State offered as evidence.  However, before the end of the hearing, the judge ruled that if she denied the motion for new trial, appellant would have the right to appeal "on the issues presented."

(Tex. Crim. App. 2006).  Because the substantive analysis is the same for both issues, we will review them together.[3]

**Applicable Law**

A guilty plea constitutes a waiver of three constitutional rights:  the right to a jury trial, the right to confront one's accusers, and the right not to incriminate oneself.  *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App.), *cert. denied,* 127 S. Ct. 667 (2006); *State v. Collazo*, No. 01-06-01076-CR, 2007 WL 3227611, at *3 (Tex. App.—Houston [1st Dist.] Nov. 1, 2007, pet. struck).  Accordingly, to be consistent with due process of law, a guilty plea must be entered knowingly, intelligently, and voluntarily.  *Kniatt*, 206 S.W.3d at 664; *Jackson v. State*, 139 S.W.3d 7, 13 (Tex. App.—Fort Worth 2004, pet. ref'd).  A plea that was not entered knowingly and voluntarily violates due process; thus, it is void.  *McCarthy v. United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 1171 (1969); *Houston v. State*, 201 S.W.3d 212, 221 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

---

[3] The State contends that the trial court gave appellant its permission to appeal only the second issue:  whether the trial court abused its discretion by denying the motion for new trial.  But it is clear from the trial court's comments at the hearing that the judge intended for the issues raised in the new trial motion to be appealable.  The only difference between the two issues is that the second issue is reviewed under a more deferential standard; because the substance is the same, we disagree that the trial court's permission does not extend to our review of both issues.

To be "voluntary," a guilty plea must be the expression of the defendant's own free will and must not have been induced by threats, misrepresentations, or improper promises. *Kniatt*, 206 S.W.3d at 664; *Collazo*, 2007 WL 3227611, at *3. A defendant's sworn representation that his guilty plea is voluntary "constitute[s] a formidable barrier in any subsequent collateral proceedings." *Kniatt*, 206 S.W.3d at 664; *Collazo*, 2007 WL 3227611, at *3; *Labib v. State*, 239 S.W.3d 322, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The voluntariness of a plea is determined by considering "all of the relevant circumstances surrounding it" and must be affirmatively shown in the record. *Houston*, 201 S.W.3d at 221; *see Brady v. United States*, 397 U.S. 742, 749, 90 S. Ct. 1463, 1469 (1970); *Boykin*, 395 U.S. at 242, 89 S. Ct. at 1712; *Labib*, 239 S.W.3d at 332. A record reflecting that a defendant was properly admonished is prima facie evidence of a knowing and voluntary guilty plea; the burden then shifts to the appellant to show that, notwithstanding the statutory admonishments, he or she did not understand the consequences of the plea. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998); *Jackson*, 139 S.W.3d at 13–14. A plea is not involuntary simply because the defendant "did not correctly assess every relevant factor entering into his

7

decision." *Talbott v. State*, 93 S.W.3d 521, 526 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

**Applicable Facts**

At the hearing on the motion for new trial, appellant testified that he talked to Robinson "for a while" before entering his plea. According to appellant, after he talked to Robinson, he thought that no African-Americans would be allowed to serve on the jury because she told him, "There ain't going to be no black folks on the jury stand. What you think those white folks are going to do to you?" He said others were there while he was talking to her and that they also encouraged him to plead guilty. But appellant also testified that he did not bring up the jury issue; Robinson did. Appellant testified that he did not commit the offense and that he would not have pled guilty but for his mistaken belief. He told Robinson he would kill himself if he had to go to prison.

Appellant further testified that he does not know how to read, that Robinson read and tried to explain the plea admonishments to him, and that he did not understand the admonishments even though he signed them. On cross-examination, appellant admitted that he had had numerous conversations with Robinson; that they had talked about the charges, whether he should testify,

and if he could get probation; and that he had told Robinson that he understood the plea paperwork after she had gone through it with him line by line.

The State asked the trial court to take judicial notice of Robinson's eleven-page affidavit, which it had filed that morning. It also offered the affidavit of an intern who worked with Robinson, as well as Robinson's records showing the many phone conversations she had with appellant. Robinson represented appellant for almost a year and a half before he pled guilty.

In her lengthy and detailed affidavit, Robinson recalls the many conversations she had with appellant both in person and by telephone and with his mother and Nicole, the mother of his child. According to Robinson, she knew appellant was slow and that he could not read, so she

> used simple words and short simple sentences . . . [,] broke things down into tiny steps and parts to ensure he understood whatever I was discussing with him . . . [,] would tell him a few things then ask questions to make sure he understood what [she] had just said . . . [, and] [i]f there was any hint that he did not understand something, . . . would go over it again and ask him more questions.

Robinson averred that appellant asked for bond reductions several times, that she tried to get his bond reduced low enough for his family to get one, but that she was unable to do so. She never had to explain to appellant what a bond was or that the judge could reduce the bond. According to Robinson, appellant wanted to go to trial; he said he was not guilty and that the child had

9

made up the story because her mother—appellant's mother's ex-lover—was angry that appellant's mother had broken up with her. Robinson averred that she investigated this defense; she gave a detailed description of her investigation and the reason why she concluded that the defense was not viable—that the breakup had occurred about two years before the outcry, that it did not seem likely that the child would have waited until two years later to make a fake outcry, and that the outcry occurred after appellant had already been sent to live in Houston, away from the child. According to Robinson, when she "expressed this concern" with appellant, "his response was to immediately say that he couldn't have 'hurt the girl' because he was living in Houston at the time he was alleged to have committed this offense." Although Robinson said she asked both appellant and his mother several times for records showing he was in Houston at that time, they never gave her any. In addition, they also told her appellant was either in jail or at the Texas Youth Commission at that time. However, according to Robinson,

> the calendar, statement of [appellant's mother's ex-lover], the time of the outcry[,] and report to the police report put the 'I was in jail' and the Houston defense in jeopardy, especially after [Robinson] received [appellant's] TYC records and compared the dates of his incarceration with the dates of the alleged offense.

Robinson also provides detail about another defense appellant asked her to investigate, her attempts to explain to him why it was not feasible, and

10

appellant's apparent understanding of her explanation. She also had to discuss

the same defense with appellant's mother and Nicole. Appellant was able to

explain what he was charged with in counts two and three of the indictment.

After providing more detail about how she would go over matters with

appellant until she felt he understood, Robinson discusses the conversation she

had with appellant about the State's ten-year plea bargain offer. According to

Robinson,

> At one point, one of the inmates in the holdover at the time said something about juries in Tarrant County being all white and 'you know what a white jury will do to you.' I intervened at that point and said: 'Please understand that I am not trying to be racist, but the reality is that in Tarrant County not a lot of black people show up for jury duty. Because of that, there might not be very many black people in the courtroom to pick a jury from. So there may be only one or two blacks on his jury.' That was all that was said about blacks being or not being on his jury. It came up only the one time during my entire representation of [appellant]. And it was raised by a comment made by another inmate.

Robinson also averred that appellant

> was receiving some encouragement to take the offer from the inmates in the holdover with him. I wasn't too concerned about this because the last time we spoke, he told me he was seriously thinking about taking the ten (10) year offer. On the day he pled, his questions and comments were not argumentative as they had been in the past. They sounded like he was going over things one last time and reassuring himself that he understood all the things we had discussed over the previous year. He finally told me he wanted to take the offer and plead guilty. The first thing I said to him after this was to ask if he was sure that was what he wanted

11

to do. He said yea. I told him that I would be glad to take his case to trial. He said he knew. He said, "Let's do it".

When she came back with the plea paperwork, appellant "appeared relieved and much more relaxed" than she had ever seen him.

Robinson then explained in detail how she went over the plea paperwork with appellant, holding the papers up to the window and pointing to each word with her pen as she read it slowly. She asked appellant what every sentence she read meant and reread it or rephrased it if he could not give her a proper answer in his own words. Robinson averred that appellant "understood every word and sentence in his plea paperwork before he went into the courtroom." Robinson further averred that

[b]efore going back into the courtroom to file the plea paperwork, I told [appellant], that even though he had signed the papers it was not too late to change his mind. He said he didn't want to take a chance on a big sentence, that he wanted to take the ten years so he would know he would be out no later than ten years from now. . . . I also reminded him about the part in the paperwork that said he would have no right to appeal if the judge went along with the plea bargain agreement. . . . I had discussed his right to appeal or complain with [appellant]. His comments indicated that he already knew basically what an appeal is. I said: "You can't complain tomorrow about what you agreed to today. You asked the judge to give you the ten years and if she does, you['re] stuck with it." He said he knew that and that he wasn't going to complain. That reminded me about his mother and Nicole. I told him that his mother would not like him taking this plea. He said he knew and then he asked me not to tell her because he wanted to tell her. I asked if he would be able to stand up to her

12

and he said he would. I have my doubts about that, but it was clear [appellant] knew she wouldn't like it.

There is no doubt in my mind that based on the facts of this case, our lack of a viable defense or witnesses, the dangers of [appellant] taking the stand and our limited punishment evidence that it was in [appellant's] best interest to take the ten year offer. There is also no doubt in my mind that he understood fully what he was doing when he told me he wanted to take the offer and he knew his mother wouldn't like it, but he wanted to do it any way [sic]. [Appellant] clearly understood his right to a trial by jury because he spent over a year asking when his trial would be. I am confident he understood the true nature of the jury system because of the questions he would ask and the comments he would make when discussing a jury trial. I know he understood he was waiving some fundamental rights because when we got to the waiver section of the plea paperwork, I told him that 'since you have all those right[s] we just talked about and we are entering into a plea bargain agreement with the state, you do not need those rights so we will waive or give up those rights. They will no longer be there for you." He said okay. . . .

I also am confident that his plea was voluntary. I know this because I reminded him before we started reading the plea papers and before I left the holdover with them that he did not have to do this, that he did not have to plead guilty. He said "Let's go ahead and do it." Even after I mentioned his mother and said she wouldn't like him doing this, [appellant] told me he knew she wouldn't but he wanted to do it anyway.

. . . [A]t no time did anyone tell [appellant] that blacks would not be allowed on his jury. An inmate said something about Tarrant County juries being white, and I explained that there tended not to be many blacks on juries here because there aren't as many blacks that show up for jury duty as there are whites. And this issue was only raised the one time. At no time did anyone tell [appellant] that blacks would not be allowed on his jury.

13

I would not have proceeded with [appellant's] plea if I had not been convinced that he fully understood what he was doing and it was his desire to do it. I had [appellant's] plea put on the record because I anticipated that his mother . . . and Nicole . . . would be upset with him for taking this plea. This was also one of the reasons I so carefully discussed everything in such detail with [appellant]. My obligation is my client and his best interest, not whether mother will be pleased. I wanted his plea on the record because I wanted it to be clear that we had discussed everything, that he understood what he had signed and what he was doing, and that he understood the consequences of entering his plea of guilty and accepting the ten year sentence.

The State also offered the affidavit of Robinson's intern, Michelle Galaviz, who averred that she was "very familiar with [appellant's] case and plea because [she had] spoken with him and his mother several times on the phone, visited him in custody, and attended several of his court settings including his March 17, 2007 setting." Galaviz spoke to appellant over thirty times on the phone and went to three or four different jail visits. In her affidavit, she describes in detail the various conversations she had with appellant.

Galaviz also describes in detail what happened when Robinson discussed the plea bargain offer with appellant. According to Galaviz,

[S]omeone also in the holdover cell yelled out something about how the juries here in Tarrant County are nothing but white people. And this showed some interest in [appellant] and also in the other jailers.

. . . Robinson started off by explaining to [appellant] how the jury selection process worked. . . . Then [she] told [appellant] that from her experience of being a prosecutor in Tarrant County, a

14

public defender in Tarrant County and now a defense attorney in Tarrant County, that blacks and Hispanics are notorious for not showing up to jury duty, but more specifically blacks. And because so few blacks show up for jury duty, there will not be much of a selection to choose from when we "pick a jury." She then told [appellant] that she knows that is not fair, and she is not racist, but that is just how things work in Tarrant County—there are "white" juries.

This was the only time I ever heard Ms. Robinson discuss "white" juries with [appellant]. And at no time did I ever hear Ms. Robinson say: "blacks will not be allowed to serve on a jury in Tarrant County."

Galaviz corroborated Robinson's account of how she explained the plea paperwork to appellant.

**Analysis**

Appellant admits that because the record shows he was properly admonished, it was his burden to show that, nevertheless, he did not enter his guilty plea knowingly and voluntarily. According to appellant, he did so because his testimony at the motion for new trial shows that he had a "fundamental misunderstanding" of the law applicable to his case and that this misunderstanding was the final factor that led to his decision to plead guilty.

We first note that the trial court's determination as to whether appellant understood Robinson's advice regarding whether African Americans would be able to serve on the jury involved questions of credibility; the trial court was not required to believe appellant's testimony at the motion for new trial. *See*

15

*Ybarra v. State*, 93 S.W.3d 922, 924–25 (Tex. App.—Corpus Christi 2002, no pet.); *Ex parte Lafon*, 977 S.W.2d 865, 868 (Tex. App.—Dallas 1998, no pet.). Rather than simply testifying that he misunderstood Robinson's explanation, appellant testified that Robinson actually told him something significantly different than what she recalled saying to him. And appellant's testimony regarding other details about their conversation was significantly different from Robinson's.[4] Additionally, Robinson's affidavit testimony was corroborated by the affidavit testimony of her intern, Galaviz.

Moreover, we conclude and hold that the totality of the circumstances as set forth in the record shows that appellant did not meet his burden to overcome the prima facie proof that his guilty plea was knowing and voluntary. Two mental health professionals examined appellant and determined he was competent and that he could understand the legal proceedings against him if

---

[4] Specifically, appellant testified that Robinson brought up the matter while Robinson testified that another inmate did. In addition, appellant testified that Robinson affirmatively told him that there wouldn't be any African Americans on the jury and that she said, "[W]hat you think those white folks are going to do to you?". Robinson said she merely explained that there might be fewer African Americans on the jury. Appellant also said that he was very upset and agitated when he and Robinson discussed the matter and that her answer was what convinced him to take the plea. Instead, Robinson recalled that the conversation was isolated, that appellant had already been considering the plea offer when the other inmates encouraged him to take it, and that on the day he pled, he was less argumentative and more relaxed than he had been before.

things were explained to him in a simple manner.[5]  The State introduced evidence at the new trial hearing that appellant had talked to his attorney or her employees over thirty times by telephone before he pled guilty.  Although appellant testified at the new trial hearing that he did not understand the plea papers even though Robinson had read and explained them to him, appellant told the judge that he did understand them when he entered his plea.  It was not until after the plea proceeding that appellant and his mother complained about the voluntariness of appellant's plea, claiming for the first time that Robinson threatened appellant and told him that no African Americans would be allowed to serve on the jury.  And, as we have already stated, the trial judge was entitled to believe Robinson's testimony on that issue instead of appellant's.

---

[5]  In his November 2006 report, Dr. Norman noted that the jail psychiatrist had stopped appellant's antipsychotic medication and recommended that the medication be restarted.  Although it is troubling that appellant was not given medication he apparently needed at some point during his incarceration, there is no indication that this medication was being withheld when he pled guilty.  Robinson was diligent in requesting evaluations of her client, doing so twice during the course of her representation.  The record as a whole indicates that she was well aware of her client's mental issues and attuned to changes in his behavior.  In addition, at the time of the motion for new trial, about a month after appellant pled guilty, appellant indicated he was being treated by Tarrant County MHMR.

Appellant contends that in reviewing the voluntariness of his plea, we should consider his subjective state of mind; in other words, although Robinson's affidavit testimony shows that she gave appellant objectively reasonable advice, we should hold the plea involuntary because appellant subjectively had a mistaken belief about what she told him.  The Fifth Circuit has held that a defendant's subjective belief alone is insufficient to invalidate a guilty plea and that a defendant must show that he was induced to plead guilty as the result of an objective misrepresentation.[6] *Montoya v. Johnson*, 226 F.3d 399, 406 (5th Cir. 2000), *cert. denied*, 532 U.S. 1067 (2001); *Matthews v. United States*, 569 F.2d 941, 943 (5th Cir.), *cert. denied*, 439 U.S. 1046 (1978); *cf*. *United States v. Robertson*, 582 F.2d 1356, 1367 (5th Cir. 1978) (noting, in context of determining whether discussions with law enforcement were for plea bargaining or other purposes, that under totality of circumstances approach, accused's subsequent account of his state of mind cannot be only deciding factor because otherwise all confessions would be vulnerable to subsequent challenge).  Here, even if we were to accept appellant's testimony at the new trial hearing as true, which the trial court was

---

[6] Texas courts may look to Fifth Circuit precedent as persuasive. *Jeffery v. State*, 169 S.W.3d 439, 443 n.1 (Tex. App.—Texarkana 2005, pet. ref'd); *see Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).

not required to do,[7] the totality of the other circumstances surrounding appellant's guilty plea nevertheless does not support a conclusion that the plea was unknowing and involuntary. *See Kniatt*, 206 S.W.3d at 664–65. Accordingly, we overrule appellant's issues on appeal.

### Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL B:   LIVINGSTON, HOLMAN, and GARDNER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: July 24, 2008

---

[7] Although we agree with appellant that his diagnosed mental health problems give some credence to his explanation at the new trial hearing, the trial court was in the better position to observe and evaluate appellant's demeanor and credibility, and it was not required to accept appellant's explanation as true simply because of the existence of his diagnosed mental health issues. *See Acosta v. State*, 160 S.W.3d 204, 210–11 (Tex. App.—Fort Worth 2005, no pet.).

19