COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-120-CR

 

 

ISSAC WRIGHT                                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

In two issues, appellant
Isaac Wright contends that his conviction and ten year sentence for aggravated
sexual assault of a child should be reversed and remanded to the trial court
for a new trial because his guilty plea was not freely and voluntarily
entered.  We affirm.

 

 

 








Background

On December 21, 2005, the
State charged appellant with three counts of aggravated sexual assault of a
child.  The trial court had already
appointed Roxanne Robinson as appellant=s attorney on October 19, 2005. 









In early January 2006,
Robinson filed a motion for a competency examination, in which she stated that
appellant Ahears
voices, . . . does not always appear to understand what is said to him and
[his] responses are frequently not responsive to [the] issue at hand.@  The trial court granted the
motion, and Dr. Ross Tatum examined appellant on January 12, 2006.  Although Dr. Tatum concluded that appellant
was competent to stand trial, he did diagnose appellant with APsychosis NOS@ and noted
that appellant=s
intelligence was Ain the low
average.@  Dr. Tatum also concluded that
appellant Ademonstrated
an understanding of the pleas of guilty and not guilty and of the plea bargain
process.  After being taught the pleas of
>no contest= and >not guilty by reason of insanity=, he was later able to again discuss these pleas and how they might be
used.@  According to Dr. Tatum,
appellant demonstrated understanding of Athe role of those who would participate in the courtroom process@ and the confidential nature of his relationship with his
attorney.  Appellant also showed Athe ability to engage in a reasonable and rational manner@; however, Dr. Tatum noted that appellant should continue his
medication and psychiatric treatment. 

Approximately nine months
later, on October 19, 2006, Robinson filed a second motion for a competency
examination, stating that appellant hears voices.  Dr. Barry Norman examined appellant and found
him competent to stand trial.  Dr. Norman=s findings regarding appellant=s mental state were similar to Dr. Tatum=s.  Dr. Norman noted that
appellant understood legal concepts better if explained to him Ain a simple straightforward manner without legal jargon.@  According to Dr. Norman, the
jail psychiatrist had discontinued appellant=s medication; Dr. Norman recommended that it be restarted
immediately.  

In November 2006, appellant
filed a pro se Application for Writ of Habeas Corpus seeking to be released
with no bond or to have his bond reduced. 
Additionally, appellant filed several pro se motions in December
2006:  a motion for examining trial,
motion for DNA testing, and motion requesting Brady evidence from the
State.  








On January 9, 2007, the State
offered appellant a ten-year plea bargain. 
Thereafter, on March 21, 2007, appellant pled guilty pursuant to the
plea bargain to one count of aggravated sexual assault of a child.  He signed written plea admonishments, and the
trial court sentenced him in accordance with the plea bargain.  On March 30, 2007, appellant=s mother wrote a letter to the court in which she claimed that
appellant was afraid for his life and did not understand what he was doing when
he pled guilty.  She claimed that
Robinson Athreaten[ed]
him and told him he could not have any black [jurors] on his case, and that
none of the witnesses . . . would be able to testify on his behalf.@  She also said that Robinson Atold him he would get 49 years and made other threats to him if he
didn=t take the 10.@  Appellant=s mother stated that the charges against appellant had been fabricated
by her ex-lover and that she was afraid for her son=s life in prison because of his medical problems.  

Appellant also wrote a letter
asking to withdraw his guilty plea because he Adid not understand and was very afraid when [Robinson] told [him] that
there could not be any black jury or any black witnesses on [his] case, and
that if [he] didn=t take the
ten year[s] that [he] would get 49 years instead.@ According to appellant, this concerned him because Aeverything about this case is black[:] 
all parties involved and all witnesses.@  








The trial court appointed new
counsel for appellant, who filed a motion for new trial on April 16, 2007
alleging that appellant=s guilty
plea was involuntary because it was based on his mistaken belief that no
African-Americans would be allowed to serve on the jury.[1]  After an evidentiary hearing on May 11, 2007,
the trial court denied the motion for new trial.  However, the trial court gave appellant
limited permission to appeal the voluntariness of his plea.[2]

Issues on Appeal








In two issues, appellant
contends that we should reverse and remand this case for a new trial because
his guilty plea was involuntary. 
Specifically, appellant contends that his guilty plea is void because it
was not entered knowingly and voluntarily, an issue we review based on the
relevant circumstances as set forth in the record.  See Boykin v. Alabama, 395 U.S. 238,
242, 89 S. Ct. 1709, 1712 (1969).  He
also contends that the trial court should have granted his motion for new trial
for the same reason, an issue we review for an abuse of discretion.  See Holden v. State, 201 S.W.3d 761,
763 (Tex. Crim. App. 2006).  Because the
substantive analysis is the same for both issues, we will review them together.[3]

Applicable Law

A guilty plea constitutes a
waiver of three constitutional rights: 
the right to a jury trial, the right to confront one=s accusers, and the right not to incriminate oneself.  Kniatt v. State, 206 S.W.3d 657, 664
(Tex. Crim. App.), cert. denied, 127 S. Ct. 667 (2006); State v.
Collazo, No. 01-06-01076-CR, 2007 WL 3227611, at *3 (Tex. App.CHouston [1st Dist.] Nov. 1, 2007, pet. struck).  Accordingly, to be consistent with due
process of law, a guilty plea must be entered knowingly, intelligently, and
voluntarily.  Kniatt, 206 S.W.3d
at 664; Jackson v. State, 139 S.W.3d 7, 13 (Tex. App.CFort Worth 2004, pet. ref=d).  A plea that was not entered
knowingly and voluntarily violates due process; thus, it is void.  McCarthy v. United States, 394 U.S.
459, 466, 89 S. Ct. 1166, 1171 (1969); Houston v. State, 201 S.W.3d 212,
221 (Tex. App.CHouston
[14th Dist.] 2006, no pet.).








To be Avoluntary,@ a guilty
plea must be the expression of the defendant=s own free will and must not have been induced by threats,
misrepresentations, or improper promises. 
Kniatt, 206 S.W.3d at 664; Collazo, 2007 WL 3227611, at
*3.  A defendant=s sworn representation that his guilty plea is voluntary Aconstitute[s] a formidable barrier in any subsequent collateral
proceedings.@  Kniatt, 206 S.W.3d at 664; Collazo,
2007 WL 3227611, at *3; Labib v. State, 239 S.W.3d 322, 332 (Tex. App.CHouston [1st Dist.] 2007, no pet.).








The voluntariness of a plea
is determined by considering Aall of the relevant circumstances surrounding it@ and must be affirmatively shown in the record.  Houston, 201 S.W.3d at 221; see
Brady v. United States, 397 U.S. 742, 749, 90 S. Ct. 1463, 1469 (1970); Boykin,
395 U.S. at 242, 89 S. Ct. at 1712; Labib, 239 S.W.3d at 332.  A record reflecting that a defendant was
properly admonished is prima facie evidence of a knowing and voluntary guilty
plea; the burden then shifts to the appellant to show that, notwithstanding the
statutory admonishments, he or she did not understand the consequences of the
plea.  Martinez v. State, 981
S.W.2d 195, 197 (Tex. Crim. App. 1998); Jackson, 139 S.W.3d at 13B14.  A plea is not involuntary
simply because the defendant Adid not correctly assess every relevant factor entering into his
decision.@  Talbott v. State, 93 S.W.3d 521, 526 (Tex.
App.CHouston [14th Dist.] 2002, no pet.).

Applicable
Facts

At the
hearing on the motion for new trial, appellant testified that he talked to
Robinson Afor a while@ before entering his plea. 
According to appellant, after he talked to Robinson, he thought that no
African‑Americans would be allowed to serve on the jury because she told
him, AThere ain=t going to
be no black folks on the jury stand.  What you think those white folks are going to
do to you?@  He said others were there while he was
talking to her and that they also encouraged him to plead guilty.  But appellant also testified that he did not
bring up the jury issue; Robinson did. 
Appellant testified that he did not commit the offense and that he would
not have pled guilty but for his mistaken belief.  He told Robinson he would kill himself if he
had to go to prison.








Appellant further testified
that he does not know how to read, that Robinson read and tried to explain the
plea admonishments to him, and that he did not understand the admonishments
even though he signed them.  On
cross-examination, appellant admitted that he had had numerous conversations
with Robinson; that they had talked about the charges, whether he should
testify, and if he could get probation; and that he had told Robinson that he
understood the plea paperwork after she had gone through it with him line by
line. 

The State asked the trial
court to take judicial notice of Robinson=s eleven-page affidavit, which it had filed that morning.  It also offered the affidavit of an intern
who worked with Robinson, as well as Robinson=s records showing the many phone conversations she had with
appellant.  Robinson represented
appellant for almost a year and a half before he pled guilty.

In her lengthy and detailed
affidavit, Robinson recalls the many conversations she had with appellant both
in person and by telephone and with his mother and Nicole, the mother of his
child.  According to Robinson, she knew
appellant was slow and that he could not read, so she 

used
simple words and short simple sentences . . . [,] broke things down into tiny
steps and parts to ensure he understood whatever I was discussing with him . .
. [,] would tell him a few things then ask questions to make sure he understood
what [she] had just said . . . [, and] [i]f there was any hint that he did not
understand something, . . . would go over it again and ask him more questions. 

 








Robinson averred that
appellant asked for bond reductions several times, that she tried to get his
bond reduced low enough for his family to get one, but that she was unable to
do so.  She never had to explain to
appellant what a bond was or that the judge could reduce the bond.  According to Robinson, appellant wanted to go
to trial; he said he was not guilty and that the child had made up the story
because her motherCappellant=s mother=s ex-loverCwas angry that appellant=s mother had broken up with her. 
Robinson averred that she investigated this defense; she gave a detailed
description of her investigation and the reason why she concluded that the
defense was not viableCthat the
breakup had occurred about two years before the outcry, that it did not seem
likely that the child would have waited until two years later to make a fake
outcry, and that the outcry occurred after appellant had already been sent to
live in Houston, away from the child. 
According to Robinson, when she Aexpressed this concern@ with appellant, Ahis response was to immediately say that he couldn=t have >hurt the
girl= because he was living in Houston at the time he was alleged to have
committed this offense.@  Although Robinson said she asked both
appellant and his mother several times for records showing he was in Houston at
that time, they never gave her any.  In
addition, they also told her appellant was either in jail or at the Texas Youth
Commission at that time.  However,
according to Robinson, 

the
calendar, statement of [appellant=s mother=s
ex-lover], the time of the outcry[,] and report to the police report put the >I was
in jail= and
the Houston defense in jeopardy, especially after [Robinson] received
[appellant=s]
TYC records and compared the dates of his incarceration with the dates of the
alleged offense.

 








Robinson also provides detail
about another defense appellant asked her to investigate, her attempts to
explain to him why it was not feasible, and appellant=s apparent understanding of her explanation.  She also had to discuss the same defense with
appellant=s mother and
Nicole.  Appellant was able to explain
what he was charged with in counts two and three of the indictment. 

After providing more detail
about how she would go over matters with appellant until she felt he
understood, Robinson discusses the conversation she had with appellant about
the State=s ten-year
plea bargain offer.  According to
Robinson,

At one point, one of the inmates in the holdover
at the time said something about juries in Tarrant County being all white and >you
know what a white jury will do to you.=  I intervened at that point and said: >Please
understand that I am not trying to be racist, but the reality is that in
Tarrant County not a lot of black people show up for jury duty.  Because of that, there might not be very many
black people in the courtroom to pick a jury from.  So there may be only one or two blacks on his
jury.=  That was all that was said about blacks being
or not being on his jury.  It came up
only the one time during my entire representation of [appellant].  And it was raised by a comment made by
another inmate. 

 

Robinson also averred that appellant








was
receiving some encouragement to take the offer from the inmates in the holdover
with him.  I wasn=t too
concerned about this because the last time we spoke, he told me he was
seriously thinking about taking the ten (10) year offer.  On the day he pled, his questions and
comments were not argumentative as they had been in the past.  They sounded like he was going over things
one last time and reassuring himself that he understood all the things we had
discussed over the previous year.  He
finally told me he wanted to take the offer and plead guilty.  The first thing I said to him after this was
to ask if he was sure that was what he wanted to do.  He said yea. 
I told him that I would be glad to take his case to trial.  He said he knew.  He said, ALet=s do
it@. 

 

When she came back with the plea paperwork,
appellant Aappeared
relieved and much more relaxed@ than she had ever seen him. 

Robinson then explained in
detail how she went over the plea paperwork with appellant, holding the papers
up to the window and pointing to each word with her pen as she read it
slowly.  She asked appellant what every
sentence she read meant and reread it or rephrased it if he could not give her
a proper answer in his own words. 
Robinson averred that appellant Aunderstood every word and sentence in his plea paperwork before he
went into the courtroom.@  Robinson further averred that








[b]efore going back into the courtroom to file
the plea paperwork, I told [appellant], that even though he had signed the
papers it was not too late to change his mind. 
He said he didn=t
want to take a chance on a big sentence, that he wanted to take the ten years
so he would know he would be out no later than ten years from now. . . .  I also reminded him about the part in the
paperwork that said he would have no right to appeal if the judge went along
with the plea bargain agreement. . . .  I
had discussed his right to appeal or complain with [appellant].  His comments indicated that he already knew
basically what an appeal is.  I said: AYou
can=t
complain tomorrow about what you agreed to today.  You asked the judge to give you the ten years
and if she does, you[>re]
stuck with it.@  He said he knew that and that he wasn=t
going to complain.  That reminded me
about his mother and Nicole.  I told him
that his mother would not like him taking this plea.  He said he knew and then he asked me not to tell
her because he wanted to tell her.  I
asked if he would be able to stand up to her and he said he would.  I have my doubts about that, but it was clear
[appellant] knew she wouldn=t like it. 

 

There is no doubt in my mind that based on the
facts of this case, our lack of a viable defense or witnesses, the dangers of
[appellant] taking the stand and our limited punishment evidence that it was in
[appellant=s]
best interest to take the ten year offer. 
There is also no doubt in my mind that he understood fully what he was
doing when he told me he wanted to take the offer and he knew his mother wouldn=t
like it, but he wanted to do it any way [sic]. 
[Appellant] clearly understood his right to a trial by jury because he
spent over a year asking when his trial would be.  I am confident he understood the true nature
of the jury system because of the questions he would ask and the comments he
would make when discussing a jury trial. 
I know he understood he was waiving some fundamental rights because when
we got to the waiver section of the plea paperwork, I told him that >since
you have all those right[s] we just talked about and we are entering into a
plea bargain agreement with the state, you do not need those rights so we will
waive or give up those rights.  They will
no longer be there for you.@  He said okay. . . .

 

I also am confident that his plea was
voluntary.  I know this because I
reminded him before we started reading the plea papers and before I left the
holdover with them that he did not have to do this, that he did not have to
plead guilty.  He said ALet=s go
ahead and do it.@  Even after I mentioned his mother and said
she wouldn=t
like him doing this, [appellant] told me he knew she wouldn=t but
he wanted to do it anyway.

 

. . . [A]t no time did anyone tell [appellant]
that blacks would not be allowed on his jury. 
An inmate said something about Tarrant County juries being white, and I
explained that there tended not to be many blacks on juries here because there
aren=t as
many blacks that show up for jury duty as there are whites.  And this issue was only raised the one
time.  At no time did anyone tell
[appellant] that blacks would not be allowed on his jury.

 








I would not have proceeded with [appellant=s]
plea if I had not been convinced that he fully understood what he was doing and
it was his desire to do it.  I had
[appellant=s]
plea put on the record because I anticipated that his mother . . . and Nicole .
. . would be upset with him for taking this plea.  This was also one of the reasons I so carefully
discussed everything in such detail with [appellant].  My obligation is my client and his best
interest, not whether mother will be pleased. 
I wanted his plea on the record because I wanted it to be clear that we
had discussed everything, that he understood what he had signed and what he was
doing, and that he understood the consequences of entering his plea of guilty
and accepting the ten year sentence.  

 

The State also offered the
affidavit of Robinson=s intern,
Michelle Galaviz, who averred that she was Avery familiar with [appellant=s] case and plea because [she had] spoken with him and his mother
several times on the phone, visited him in custody, and attended several of his
court settings including his March 17, 2007 setting.@  Galaviz spoke to appellant
over thirty times on the phone and went to three or four different jail
visits.  In her affidavit, she describes
in detail the various conversations she had with appellant.  

Galaviz also describes in
detail what happened when Robinson discussed the plea bargain offer with
appellant.  According to Galaviz,

[S]omeone also in the holdover cell yelled out
something about how the juries here in Tarrant County are nothing but white
people.  And this showed some interest in
[appellant] and also in the other jailers.

 








. . . Robinson started off by explaining to
[appellant] how the jury selection process worked. . . .  Then [she] told [appellant] that from her
experience of being a prosecutor in Tarrant County, a public defender in
Tarrant County and now a defense attorney in Tarrant County, that blacks and
Hispanics are notorious for not showing up to jury duty, but more specifically
blacks.  And because so few blacks show
up for jury duty, there will not be much of a selection to choose from when we Apick
a jury.@  She then told [appellant] that she knows that
is not fair, and she is not racist, but that is just how things work in Tarrant
CountyCthere
are Awhite@
juries.

 

This was the
only time I ever heard Ms. Robinson discuss Awhite@ juries with
[appellant].  And at no time did I ever
hear Ms. Robinson say:  Ablacks will not be allowed to serve on a jury in Tarrant County.@ 

Galaviz corroborated Robinson=s account of how she explained the plea paperwork to appellant.  

Analysis

Appellant admits that because
the record shows he was properly admonished, it was his burden to show that,
nevertheless, he did not enter his guilty plea knowingly and voluntarily.  According to appellant, he did so because his
testimony at the motion for new trial shows that he had a Afundamental misunderstanding@ of the law applicable to his case and that this misunderstanding was
the final factor that led to his decision to plead guilty. 








We first note that the trial
court=s determination as to whether appellant understood Robinson=s advice regarding whether African Americans would be able to serve on
the jury involved questions of credibility; the trial court was not required to
believe appellant=s testimony
at the motion for new trial.  See
Ybarra v. State, 93 S.W.3d 922, 924B25 (Tex. App.CCorpus
Christi 2002, no pet.); Ex parte Lafon, 977 S.W.2d 865, 868 (Tex. App.CDallas 1998, no pet.).  Rather
than simply testifying that he misunderstood Robinson=s explanation, appellant testified that Robinson actually told him
something significantly different than what she recalled saying to him.  And appellant=s testimony regarding other details about their conversation was
significantly different from Robinson=s.[4]  Additionally, Robinson=s affidavit testimony was corroborated by the affidavit testimony of
her intern, Galaviz.








Moreover, we conclude and
hold that the totality of the circumstances as set forth in the record shows
that appellant did not meet his burden to overcome the prima facie proof that
his guilty plea was knowing and voluntary. 
Two mental health professionals examined appellant and determined he was
competent and that he could understand the legal proceedings against him if
things were explained to him in a simple manner.[5]  The State introduced evidence at the new
trial hearing that appellant had talked to his attorney or her employees over
thirty times by telephone before he pled guilty.  Although appellant testified at the new trial
hearing that he did not understand the plea papers even though Robinson had read
and explained them to him, appellant told the judge that he did understand them
when he entered his plea.  It was not
until after the plea proceeding that appellant and his mother complained about
the voluntariness of appellant=s plea, claiming for the first time that Robinson threatened appellant
and told him that no African Americans would be allowed to serve on the
jury.  And, as we have already stated,
the trial judge was entitled to believe Robinson=s testimony on that issue instead of appellant=s.













Appellant contends that in
reviewing the voluntariness of his plea, we should consider his subjective
state of mind; in other words, although Robinson=s affidavit testimony shows that she gave appellant objectively
reasonable advice, we should hold the plea involuntary because appellant
subjectively had a mistaken belief about what she told him.  The Fifth Circuit has held that a defendant=s subjective belief alone is insufficient to invalidate a guilty plea
and that a defendant must show that he was induced to plead guilty as the
result of an objective misrepresentation.[6]  Montoya v. Johnson, 226 F.3d 399, 406
(5th Cir. 2000), cert. denied, 532 U.S. 1067 (2001); Matthews v.
United States, 569 F.2d 941, 943 (5th Cir.), cert. denied, 439 U.S.
1046 (1978); cf. United States v. Robertson, 582 F.2d 1356, 1367
(5th Cir. 1978) (noting, in context of determining whether discussions with law
enforcement were for plea bargaining or other purposes, that under totality of
circumstances approach, accused=s subsequent account of his state of mind cannot be only deciding
factor because otherwise all confessions would be vulnerable to subsequent
challenge).  Here, even if we were to
accept appellant=s testimony
at the new trial hearing as true, which the trial court was not required to do,[7]
the totality of the other circumstances surrounding appellant=s guilty plea nevertheless does not support a conclusion that the plea
was unknowing and involuntary.  See
Kniatt, 206 S.W.3d at 664B65.  Accordingly, we overrule
appellant=s issues on
appeal.

Conclusion

Having overruled both of
appellant=s issues, we
affirm the trial court=s judgment.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON,
HOLMAN, and GARDNER, JJ.

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED: July 24, 2008











[1]In an
affidavit attached to the motion, counsel notes appellant=s
mental issues and says appellant told him Tarrant County MHMR was currently
treating him. 





[2]The
trial court did not rule on the motion at the hearing; instead, the judge
deferred ruling until after she had read affidavits from Robinson and her intern
that the State offered as evidence. 
However, before the end of the hearing, the judge ruled that if she
denied the motion for new trial, appellant would have the right to appeal Aon
the issues presented.@ 





[3]The
State contends that the trial court gave appellant its permission to appeal
only the second issue:  whether the trial
court abused its discretion by denying the motion for new trial.  But it is clear from the trial court=s
comments at the hearing that the judge intended for the issues raised in the
new trial motion to be appealable.  The
only difference between the two issues is that the second issue is reviewed
under a more deferential standard; because the substance is the same, we
disagree that the trial court=s permission does not extend
to our review of both issues.





[4]Specifically,
appellant testified that Robinson brought up the matter while Robinson
testified that another inmate did.  In
addition, appellant testified that Robinson affirmatively told him that there
wouldn=t be
any African Americans on the jury and that she said, A[W]hat
you think those white folks are going to do to you?@.  Robinson said she merely explained that there
might be fewer African Americans on the jury. 
Appellant also said that he was very upset and agitated when he and
Robinson discussed the matter and that her answer was what convinced him to
take the plea.  Instead, Robinson
recalled that the conversation was isolated, that appellant had already been
considering the plea offer when the other inmates encouraged him to take it,
and that on the day he pled, he was less argumentative and more relaxed than he
had been before.





[5]In
his November 2006 report, Dr. Norman noted that the jail psychiatrist had
stopped appellant=s
antipsychotic medication and recommended that the medication be restarted.  Although it is troubling that appellant was not
given medication he apparently needed at some point during his incarceration,
there is no indication that this medication was being withheld when he pled
guilty.  Robinson was diligent in
requesting evaluations of her client, doing so twice during the course of her
representation.  The record as a whole
indicates that she was well aware of her client=s
mental issues and attuned to changes in his behavior.  In addition, at the time of the motion for
new trial, about a month after appellant pled guilty, appellant indicated he
was being treated by Tarrant County MHMR.





[6]Texas
courts may look to Fifth Circuit precedent as persuasive.  Jeffery v. State, 169 S.W.3d 439, 443
n.1 (Tex. App.CTexarkana
2005, pet. ref=d); see
Penrod Drilling Corp. v. Williams, 868 S.W.2d 294, 296 (Tex. 1993). 





[7]Although
we agree with appellant that his diagnosed mental health problems give some
credence to his explanation at the new trial hearing, the trial court was in
the better position to observe and evaluate appellant=s
demeanor and credibility, and it was not required to accept appellant=s
explanation as true simply because of the existence of his diagnosed mental
health issues.  See Acosta v. State,
160 S.W.3d 204, 210B11
(Tex. App.CFort
Worth 2005, no pet.).